Mrs. J. v. Strafford School                CV-03-228-SM  06/28/04
                   UNITED STATES DISTRICT COURT

                     DISTRICT OF NEW HAMPSHIRE


Mrs. J.,
      Plaintiff

      v.                                   Civil No. 03-228-SM
                                           Opinion No. 2004 DNH 100
Strafford School District,
      Defendant


                          **O R D E R**


      Pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400 et seq., Mrs. J., mother of

Christopher J., appeals an educational hearing officer's decision

which was, at least in part, in favor of the local school

district.  See 20 U.S.C. § 1415(i)(2).  She claims that the

hearing officer "erred by failing to order extended school day

programming [for Christopher] for approximately 11 hours per day,

five days per week."  Plaintiff's Stipulation Regarding Issues

Plaintiff Plans to Raise on Appeal (document no. 31) at para. 1.

She also seeks a judicial declaration that she is the "prevailing

party" and, therefore, entitled to an award of attorney's fees

and costs.  In its counterclaim, the School District challenges

the hearing officer's determination that Christopher is entitled to direct, one-on-one occupational therapy.

The parties have filed a "certificate of completion," as well as their respective decision memoranda. See Local Rule 9.3(b) and (e). Neither party requested a hearing to present oral argument or additional evidence. The parties have, however, agreed to postpone any ruling on plaintiff's request for attorney's fees, pending resolution of their substantive challenges to the hearing officer's decision. See Stipulation to Bifurcate the Issues (document no. 18).

## Background

The administrative record in this case consists of eight bound volumes containing approximately 4,400 pages (document nos. 8 and 14). And, under Local Rule 9.3(d), the parties have filed a statement of stipulated facts (document no. 28). The facts relevant to the disposition of this matter are discussed as appropriate, and are drawn from the stipulation and administrative record.

## Standard of Review

Congress enacted the Individuals with Disabilities Education Act "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). Under the scheme established by the IDEA, and in return for federal funding, state educational agencies establish procedures to identify and evaluate disabled students in need of special education services. See 20 U.S.C. § 1412. For each identified child, a team comprised of the child's parents, teachers, and a representative of the educational agency develops an individualized education plan ("IEP") for the child.

An IEP consists of "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of [the IDEA]." 20 U.S.C. § 1401(11). It must be "reasonably calculated to enable the child to receive educational benefits," Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982), and "custom tailored to address the

3

[disabled] child's 'unique needs,'" <u>Lenn v. Portland Sch. Comm.</u>, 998 F.2d 1083, 1086 (1st Cir. 1993) (citing 20 U.S.C. § 1400(c)).

Importantly, however, neither the IDEA nor New Hampshire law requires the IEP to "maximize" a child's educational benefits. <u>See, e.g.</u>, <u>Lenn</u>, 998 F.2d at 1086 (holding that, under the IDEA, "the benefit conferred [by the IEP] need not reach the highest attainable level or even the level needed to maximize the child's potential."). Instead, the IDEA establishes more modest goals and imposes upon states and local school districts an obligation to provide a program that is "sufficient to confer some educational benefit upon the handicapped child." <u>Rowley</u>, 458 U.S. at 200.

> We therefore conclude that the "basic floor of
> opportunity" provided by the Act consists of access to
> specialized instruction and related services which are
> individually designed to provide educational benefit to
> the handicapped child.

<u>Id.</u> at 201.

If a parent believes that a proposed IEP will not provide an appropriate education, or that the procedures established by the

IDEA have not been properly followed in developing the IEP, he or she may request an administrative due process hearing to review the matter. See 20 U.S.C. § 1415(f). If a parent, or the affected school district, is dissatisfied with the administrative hearing officer's ruling, that party may seek judicial review in either state or federal court. 20 U.S.C. § 1415(i)(2).

A district court's review of state educational administrative proceedings has been described as "one of involved oversight." Lenn, 998 F.2d at 1087 (citing Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)). The applicable standard is an intermediate one under which the district court must exercise independent judgment, but, at the same time, give "due weight" to the administrative proceedings.

> The required [judicial review] must, at one and the
> same time, be thorough yet deferential, recognizing the
> expertise of the administrative agency, considering the
> agency's findings carefully and endeavoring to respond
> to the hearing officer's resolution of each material
> issue. Jurists are not trained, practicing educators.
> Thus, the statutory scheme binds trial courts to give
> 'due weight' to the state agency's decision in order to
> prevent judges from imposing their view of preferable
> educational methods upon the States.

Roland M., 910 F.2d at 989 (citations and internal punctuation omitted). See also T.B. v. Warwick Sch. Comm., 361 F.3d 80, 83-84 (1st Cir. 2004).

District court review is focused on two questions: (1) whether the parties complied with the procedural requirements of the IDEA; and (2) whether the IEP developed through those procedures was reasonably calculated to enable the disabled child to receive educational benefits. See, e.g., Rowley, 458 U.S. at 206-07. The burden of proof rests with the party challenging the administrative decision. See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992); Roland M., 910 F.2d at 991.

With those principles in mind, the court turns to the parties' respective challenges to the hearing officer's decision, dated January 28, 2003.

## Discussion

I.   Non-residential Placement of Christopher.

The hearing officer concluded that placement of Christopher in a day program at Wediko Children's Services was appropriate.

Record at 3776.  Plaintiff challenges that decision, claiming that, in order to receive adequate "educational benefit" from the Wediko program, Christopher needs "extended school day programming 11 hours per day."  Plaintiff's stipulation, at para. 3.  Given the duration of Christopher's daily commute to Wediko, such programming would, in effect, require a residential placement.  The School District, on the other hand, contends that the hearing officer correctly determined that a residential placement is not appropriate for Christopher, and would prove unnecessarily restrictive.

At the time of the administrative due process hearing, Christopher was 15 years old and in tenth grade.  While he has an above-average intellect, Christopher suffers from fairly substantial disabilities (primarily affecting his ability to control moods, express emotions, and understand unspoken verbal ques, such as facial expressions), all of which make identifying an appropriate educational placement for him quite difficult.  That problem has been exacerbated by his somewhat "chaotic" home life, record at 3767, see also id. at 232-42, his parents' inconsistent methods of instructing and disciplining him, and the

7

parents' (primarily Mrs. J.'s) substantial lack of cooperation with the School District - all of which is well-documented in the record and addressed in the hearing officer's decision. Among other things, the hearing officer noted:

> It is also clear that the District was not provided with all available information in developing the IEP and that the parent gave virtually no prior notice to the District nor facilitated a cooperative atmosphere in creating the proposed IEP. The parent's two witnesses never made any recommendation to the District for residential placement prior to their testimony at the hearing. The Occupational Therapy Report was never made available to the District. The District was never given information regarding [Christopher] being in counseling with Dr. Weaver. In addition, the District was not told prior to the hearing about problems that [Christopher] was experiencing at home in the fall of 2002. . . . It is clear to the undersigned that [Christopher's] parents will not cooperate in determining whether the Seacoast Learning Collaborative is the appropriate placement for [Christopher].

Id. at 3775-76.

Notwithstanding the hurdles created by Mrs. J., the hearing officer concluded that, while not optimal, placement in the "Wediko Day program is appropriate." Record at 3776. He specifically concluded that a residential placement, such as that sought by Mrs. J., would be "unnecessarily restrictive." Id.

8

> Testimony from Wediko's witness indicated that if
> [Christopher's] curriculum were modified, then therapy
> during the school day could be included into
> [Christopher's] program. That is appropriate for
> [Christopher] and should be done forthwith. . . . The
> Hearing Officer is concerned about the amount of time
> [Christopher] is forced to spend on the bus each day.
> However, given the parent's unwillingness to explore
> Seacoast Learning Collaborative as an option and given
> the agreement by the parties that the other proposed
> placements are not appropriate, there appears to be no
> other viable alternative.

Id. As suggested by the hearing officer, the most viable
alternative educational placement for Christopher would appear to
be the Seacoast Learning Collaborative, which is located closer
to his home. If Christopher were to attend that school, not only
would his daily commute be significantly shorter, but he would
also be able to travel on the bus with other students from his
district. But, Mrs. J. refused to allow Seacoast's
administrators to interview Christopher.[1]

---

[1] It is not entirely clear why Mrs. J. refused to permit
Seacoast to meet with Christopher. There is, however, evidence
in the record suggesting that if Seacoast had been seriously
explored as a placement for Christopher, and if it had been
determined to be an appropriate placement for him, the School
District could not obtain approval to place Christopher at Wediko
(because, unlike Seacoast, Wediko is not approved to treat
Christopher's primary disability). Record at 488-89. In other
words, Wediko was approved as Christopher's placement only
because no other viable alternatives were deemed available. Had
the IEP team determined that Seacoast was an appropriate

Perhaps not surprisingly, Mrs. J points to Christopher's lengthy daily commute to Wediko as one factor supporting her view that the hearing officer erred in approving placement for Christopher in Wediko as a day student, rather than as a residential student. See Plaintiff's decision memorandum (document no. 32) at 19 n. 14. But, if Christopher's commute posed a serious concern for his parents, it is difficult to explain Mrs. J.'s lack of cooperation with the School District in exploring the possibility of a placement closer to home - particularly at Seacoast, which appears to offer comparable (if not superior) services to those available at Wediko. See, e.g., Record at 480-90. Mrs. J. cannot now be heard to complain that Wediko is so distant that the School District should be required to fund Christopher's residential placement there - not when there are seemingly viable alternatives much closer to home,

---

placement, that determination would have eliminated any possibility of sending Christopher to Wediko, which is where Mrs. J. wanted Christopher placed.

There is also evidence indicating that because Christopher was experiencing problems at home with his mother, step-father, and half-siblings, Dr. Weaver, plaintiff's expert and "advocate," sought a residential placement for Christopher, at least in part, to "give the parents a break." Record at 539.

which have yet to be fully explored due to her own uncooperative conduct.

As further support for her assertion that the IDEA mandates a residential placement at Wediko for Christopher, plaintiff says that only a residential placement will adequately address all of Christopher's needs - not just academically, but also in the areas of socialization, adaptive behavior, emotional well-being, etc. While a residential placement at Wediko might well provide additional benefit and structure for Christopher, the record amply supports the hearing officer's determination that Christopher can receive meaningful and appropriate educational benefit from his placement in Wediko as a day student, provided his curriculum is modified to allow therapy during the day and a behavior modification plan is developed and implemented at home. The record plainly reveals that Christopher requires a great deal of structure and an established daily routine. There does not, however, appear to be any reason that he cannot receive the necessary structure and routine in the home environment, provided his parents fully cooperate with the School District and Dr.

11

Pierce-Jordan, in implementing the proposed behavior modification plan.

Although a non-residential placement at Wediko may not be "optimal" for Christopher, Mrs. J has artificially limited the options available. More to the point, however, the School District is not required to provide special education services designed to maximize Christopher's potential. Rather, it is obligated to deliver services that "confer some educational benefit" upon him. Rowley, 458 U.S. at 200. As the court of appeals for this circuit has observed:

> Since Rowley's construction of the EHA, a [free appropriate public education or "FAPE"] has been defined as one guaranteeing a reasonable probability of educational benefits with sufficient supportive services at public expense. Following Rowley, courts have concluded that a FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice, or even the best choice. Barring higher state standards for the handicapped, a FAPE is simply one which fulfills the minimum federal statutory requirements.

G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948 (1st Cir. 1991) (emphasis in original). See also Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 132 (2d Cir. 1998) ("IDEA does not

12

require states to develop IEPs that maximize the potential of handicapped children.  What the statute guarantees is an 'appropriate' education, not one that provides everything that might be thought desirable by loving parents.") (citations and internal quotation marks omitted).

Mrs. J has failed to carry her burden of demonstrating that the hearing officer erred when he concluded that a non-residential placement at Wediko was appropriate for Christopher, nor has she shown that the IDEA mandates that Christopher receive a residential placement at Wediko.  Mrs. J. has not shown (nor does the record support) that Christopher "is properly educable only through a residential placement."  Plaintiff's decision memorandum at 20, n.15 (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1039 (2d Cir. 1997)).

II.  One-on-One Occupational and Speech Therapy.

The School District challenges the hearing officer's determination that Christopher's IEP must include "direct 1:1 Occupational Therapy and Speech Language Services."  Record at 3776.  Although the hearing officer's decision is not entirely

13

clear on this point, Mrs. J. asserts that such therapy was ordered for 60 minutes each week. See, e.g., Plaintiff's Reply Memorandum (document no. 39) at 9. The School District disagrees and notes that the hearing officer did not specify how much therapy should be provided.

Regardless of how much occupational therapy the hearing officer intended for Christopher, the School District says he erred in ordering any one-on-one therapy. In support of that view, the School District first asserts that "[t]here is no evidence that Christopher would fail to benefit from special education without one-on-one occupational therapy." Defendant's Decision Memorandum (document no. 33) at 24. That reasoning is unpersuasive. Developing an appropriate IEP is more art than science. Accordingly, in preparing an IEP, the relevant parties must often rely upon the educated opinions (and, to some degree, speculation) of trained experts as to how they believe a particular student is likely to react to a particular program. Suggesting that plaintiff must demonstrate that the absence of direct occupational therapy has proved a hindrance to

14

Christopher's progress is a bit like requiring plaintiff to prove a negative.

The School District's second argument is more compelling. While it appears that Christopher has never received direct, one-on-one therapy in the past (at least in the context of a school setting), he did receive occupational therapy in a small group setting when he attended the Lighthouse School, in Chelmsford, Massachusetts. That therapy proved to be less beneficial than anticipated.

After Christopher enrolled at Lighthouse, Mrs. J. asked that his IEP be modified to provide for one hour each week of small-group therapy. In light of Christopher's progress (both academically and behaviorally), Lighthouse did not believe such therapy was necessary. It did, however, agree to implement the change to Christopher's IEP. Scott Bartis, the Director of Applied Services at Lighthouse, described the small-group therapy, and Christopher's reaction to it, as follows:

> Christopher was initially a willing participant in that
> small group. As the year went on, conflicts arose when
> he went to [occupational therapy], because he would

15

rather play or use other equipment, such as the swing, rather than performing his prescribed OT exercises. As the year went on, Christopher refused to attend those OT sessions. The OT sessions were designed to teach Christopher strategies to use during the regular day to regulate his sensory motor functioning. Christopher was provided with OT strategies and demonstrated that he could perform them. But Christopher refused to consistently apply those strategies outside of the OT sessions.

Record at 2247, Affidavit of Scott Bartis, at para. 20. Thus, it appears that removing Christopher from regular class programming so that he might attend small-group occupational therapy was not a productive aspect of his IEP.

Despite the lack of progress noted in small-group therapy, it appears that Christopher progressed well under the IEP implemented at Lighthouse. Dr. Bartis reported:

Academically, Christopher made slow but steady progress and passed all of his course. He did not work up to his full potential academically and seldom went beyond basic expectations academically. However, given his disabilities, which were primarily in the social/emotional/behavioral domain, Lighthouse School focused less on academics and more on the social/emotional/behavioral domain. Hence, the clinical approach.

In the social, behavioral and emotional domains, Christopher made substantial progress. Examples include: developing trusting relationships with staff;

16

reduced need for physical intervention such as restraints[;] reduced time in the crisis room[;] and improved ability to express his needs and feelings in a socially appropriate manner. When he first arrived at Lighthouse, he would often be out of control, while insisting that he was in control, and could not tell us how he felt or what he needed. As time went on, his behavior, emotional status, and social skills improved. There were fewer social conflicts with adults and peers and his ability to resolve social conflicts with adults and peers improved.

Id. at 2445-46. Of additional significance are the following observations made by Dr. Bartis:

As the year went on, disagreement arose between Lighthouse and the school district on one hand, and Christopher's parents on the other hand, regarding Christopher's needs and how they should be addressed. This led to a number of long team meetings. As a consequence, during the spring of 2002, a consensus emerged that Christopher should attend another school for the following school year. However, Lighthouse never concluded that Christopher required a more restrictive program. My staff and I agreed that Lighthouse was an appropriate program for Christopher, but for his parents' dissatisfaction. Given his profile, we anticipated during the 2001-2002 school year that Christopher would be ready to return to a public school by the 2003-2004 school year. We certainly did not believe that he required a residential placement or an extended school day.

Id. at 2446. Given the substantial progress that Christopher made while at the Lighthouse School (notwithstanding the lack of tangible benefits from the small-group therapy sessions) -

17

progress that was so significant that staff and administrators at Lighthouse expected that, if it continued, he would soon be able to return to a public school setting - and given Christopher's history of resistance to therapy that requires him to be absent from the main classroom, the court concludes that the hearing officer erred in ordering direct, one-on-one therapy for Christopher each week. A less restrictive educational plan has proved successful in the past (and the more restrictive alternative has proved less than successful). See generally 34 C.F.R. § 300.550(b)(2). And, there is no indication that Christopher would not respond in an equally meaningful way at Wediko, with occupational therapy being imbedded into his classroom services, as the School District has proposed.

There is, to be sure, evidence in the record suggesting that Christopher might benefit from direct occupational therapy. See Record at 1836-52, Occupational Therapy Evaluation prepared by Mary C. Bamford, dated July 27, 2001. In her report, Ms. Bamford opined that "Chris presents as a candidate for direct Occupational Therapy services as part of his comprehensive

18

intervention program." Id. at 1848. She repeated that opinion in a more recent report dated August 19, 2002. Id. at 911.[2]

That Christopher would benefit from direct, one-on-one occupational therapy is not, however, dispositive. As the court of appeals for this circuit recently observed, the "IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." T.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004) (citations omitted). Having reviewed the record, and having afforded due weight to the hearing officer's decision, id. at 83, the court concludes that the School District has demonstrated, by a preponderance of the evidence, id., that the IEP prepared for Christopher (in consultation with Dr. Sandra Pierce-Jordan), which provides extensive services for him,

---

[2] The opinions expressed in Ms. Bamford's report dated August 19, 2002, are virtually identical to those expressed in her earlier report (many are repeated verbatim) and were not based upon any new or additional testing of Christopher - all are based upon her evaluation of Christopher on July 27, 2001, prior to Christopher's enrollment at Lighthouse in September of 2001. Accordingly, it does not appear that Ms. Bamford was aware of Christopher's progress at Lighthouse or, even if she was, that her most recent recommendations took such progress into account.

19

including one-on-one therapy "as needed" and group therapy for at least one hour each day, is "reasonably calculated" to provide Christopher with an "appropriate" education. See generally Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982). See also G.D. v. Westmoreland Sch. Dist., 930 F.2d at 948-49. It must be kept in mind that:

> The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

Lenn, 998 F.2d at 1086. The level of occupational therapy services offered by Christopher's IEP certainly meets (and exceeds) minimum federal statutory requirements; the hearing officer erred in concluding otherwise.

## Conclusion

While some might argue that the services the School District, through Wediko, provides to Christopher are not

20

sufficient to maximize his educational and developmental potential, neither the IDEA nor New Hampshire law requires the School District to provide an "optimal" educational environment. Rather, the School District is obligated to offer Christopher a learning environment and educational plan that provides demonstrable "educational benefit." Toward that end, the School District has provided extensive educational and special needs services to Christopher (along with substantial counseling services to his family members).

Given the facts presented, the School District will certainly meet its legal obligations to Christopher by implementing his IEP at Wediko as a day, rather than residential, student. With regard to the issue of one-on-one direct occupational therapy, the court agrees with the School District that such services are not required to provide Christopher with a free appropriate public education, and that the hearing officer erred in ordering the School District to provide such services. That aspect of the hearing officer's decision is, therefore, vacated. It all other respects, the decision is affirmed.

21

In light of the parties' stipulation concerning the resolution of plaintiff's request for attorney's fees, the court will defer any ruling on that issue pending additional briefing by the parties. As the party seeking such fees, plaintiff shall, on or before July 16, 2004, file a well-supported legal memorandum presenting her argument(s) in favor of an award of attorney's fees, given the decision on the merits of her appeal. The School District shall file a responsive memorandum within 21 calendar days thereafter.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 28, 2004

cc:  Gerald M. Zelin, Esq.
     Gregory W. Swope, Esq.
     Richard L. O'Meara

22