# United States Court of Appeals

## For the First Circuit

Nos. 02-2187, 02-2188

VICTORIA LIS ALBERTY-VÉLEZ,

Plaintiff, Appellant/Cross-Appellee,

v.

CORPORACIÓN DE PUERTO RICO PARA LA DIFUSIÓN
PÚBLICA, D/B/A WIPR CHANNEL 6,
Defendant, Appellee/Cross-Appellant,

JORGE INSERNI, PERSONALLY AND AS EXECUTIVE DIRECTOR,
WILLIAM DENIZARD; COCO SALAZAR; CONJUGAL PARTNERSHIP
DENIZARD-SALAZAR; CONCEPTO CREATIVO; MEMBERS OF THE
BOARD OF DIRECTORS OF THE CORPORACIÓN DE PUERTO RICO
PARA LA DIFUSIÓN PÚBLICA, D/B/A WIPR CHANNEL 6; JOHN DOE,
96CV1487; RICHARD ROE, 96CV1487; A TO Z INSURANCE CO.;
XYZ INSURANCE CO.,
Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Justo Arenas, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Lynch and Howard, Circuit Judges.

Alberto G. Estrella with whom William Estrella Law Offices,
PSC was on brief, for appellant.
James D. Noël, III with whom McConnell Valdès was on brief,
for appellee.

March 2, 2004

**HOWARD**, **Circuit Judge**.  This pregnancy and gender discrimination case is before us for the second time.  See Alberty-Vélez v. Corporación de Puerto Rico Para La Difusión Pública, 242 F.3d 418 (1st Cir. 2001) ("Alberty-Vélez I").  Despite its complicated history, this second appeal presents a familiar question--did the district court correctly grant summary judgment for the defendant?  We conclude that summary disposition was appropriate because a reasonable fact finder could only conclude that the plaintiff was an independent contractor and therefore not covered by Title VII or the Puerto Rico anti-discrimination laws. Accordingly, we affirm.

## I.  Background and Prior Proceedings

Victoria Lis Alberty-Vélez brought suit against Corporación de Puerto Rico para la Difusión Pública ("WIPR") for pregnancy and gender discrimination, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, P.R. Laws Ann. Tit. 29, 146 et seq., and P.R. Laws Ann. Tit. 29, 467 et seq.  Because our decision rests on Alberty's independent contractor status, we limit our factual summary to the undisputed facts concerning the parties' relationship.[1]

---

[1]Our ability to determine the undisputed facts has been hampered by Alberty's failure to file a compliant brief.  Alberty failed to provide appendix citations for her recitation of the facts relevant to her employee status argument.  See Fed. R. App. P. 28(a)(7).  We will resolve any resulting uncertainty against Alberty.  See Credit Francais, Int'l v. Bio-Vita, Ltd., 78 F.3d 698, 701 (1st Cir. 1996).

Alberty's relationship with WIPR, a Puerto Rico television station, began in 1993, when she agreed to host its new show "Desde Mi Pueblo." This program profiled municipalities throughout Puerto Rico by presenting interviews with residents and interesting information about the featured community. The show had three hosts, Alberty, Luis Antonio Rivera, and Deborah Carthy Deu.

Alberty appeared on the program from July 1993 until November 1994. Instead of signing a single contract to host the show, Alberty signed a new contract for each episode. Each contract obligated Alberty to work a certain number of days (usually two) filming the show in a specific town. Under the parties' arrangement, Alberty was not obliged to film additional episodes beyond the one for which she contracted, and WIPR was not obliged to enter into contracts with Alberty for additional episodes.

Filming of the show did not occur weekly, and Alberty was not obligated to WIPR during off weeks. On the days that Alberty filmed the show, she was on-call for the entire day. During her "off" time, in addition to preparing for future episodes of "Desde Mi Pueblo", Alberty worked other jobs, including acting on another WIPR show entitled "Será Acaso Este Su Caso," hosting a concert for the Piano Suzuki Company, and acting as the master of ceremonies

for the graduation of the Academia Infantil Nairda Hernández.[2] Alberty's contracts did not permit WIPR to require her to do work other than film "Desde Mi Pueblo."

While filming "Desde Mi Pueblo," Alberty was directed by William Denizard, the show's producer. He set the location and hours of filming, and established the basic content of the program. WIPR provided the equipment for filming (i.e., lights, camera, and makeup). Alberty was responsible for providing her clothing, shoes, accessories, hair stylist and the other services and materials required for her appearance on the show. She could either purchase these services and materials herself or locate sponsors to provide them for her. WIPR had to approve any sponsors that Alberty wished to use.

Alberty received a lump sum payment for each episode of "Desde Mi Pueblo" that she filmed, ranging from $400 to $550. To receive payment, Alberty presented a signed invoice to WIPR showing that she had performed the agreed upon work. WIPR did not withhold income or social security taxes from Alberty's check and did not provide Alberty with benefits such as health insurance, life insurance, retirement, paid sick leave, maternity leave, or vacation. On her tax return, Alberty described her income as

---

[2]Alberty had a similar lump sum payment arrangement with WIPR for her work on "Será Acaso Este Su Caso." When Alberty performed on both "Desde Mi Pueblo" and "Será Acaso Este Su Caso," she received separate checks for each performance.

deriving from professional services rendered, and WIPR did not provide Alberty with an Internal Revenue Service Form W-2. After her separation, Alberty received unemployment compensation from the Puerto Rico Department of Labor indicating that this agency considered her WIPR's employee.

Alberty's employee status has been contested throughout the course of this litigation. On December 24, 1998, the district court granted partial summary judgment for Alberty on this issue, see Fed. R. Civ. P. 56(d), declaring her an employee of WIPR. At the subsequent trial, the district court reversed course and granted WIPR's motion for judgment as a matter of law, see Fed. R. Civ. P. 50, because Alberty was an independent contractor. In Alberty-Vélez I, 242 F.3d at 421-26, we vacated this judgment because the district court did not provide Alberty with notice of its intention to revisit the employee/independent contractor issue at trial, thereby denying Alberty a fair opportunity to contest this issue.

On remand, the parties consented to assigning the case to a magistrate judge. After the case was reassigned, WIPR filed a motion for summary judgment on the employee/independent contractor issue. Alberty opposed the motion both on the merits and on the ground that the issue should not be reconsidered in light of the earlier ruling declaring Alberty an employee. The district court

entertained WIPR's summary judgment motion but denied it because of factual disputes.[3]

Alberty and WIPR also cross-moved for summary judgment on the discrimination issue. The district court determined that there was no evidence of discriminatory animus by WIPR toward Alberty and accordingly entered judgment in WIPR's favor. Alberty appealed.[4]

## II. Summary Judgment Standard

We review summary judgment rulings de novo. See Serapion v. Martínez, 119 F.3d 982, 987 (1st Cir. 1997). A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[3]Alberty cross-moved for summary judgment on the employee status issue. The district court also denied this motion.

[4]WIPR cross-appealed from the denial of its motion for summary judgment based on independent contractor status. This was not the proper procedure. A party may not appeal from a favorable judgment. See California v. Rooney, 483 U.S. 307, 311 (1987). WIPR received the entire relief that it sought from the district court (i.e., favorable judgment on all counts) and therefore cannot appeal. See Deposit Guaranty Nat. Bank v. Roper, 445 U.S. 326, 333 (1980) (A "party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it."). However, on appeal, WIPR may argue for affirming the summary judgment ruling based on arguments that the district court rejected. See United States v. American Ry. Express Co., 265 U.S. 425, 435 (1924) ("[T]he appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it."). Therefore, WIPR may argue, in opposition to Alberty's appeal, that the summary judgment ruling was correct because Alberty was an independent contractor. We will treat WIPR's cross-appeal as a request that we affirm the summary judgment ruling on this basis.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

We may affirm a summary judgment ruling on any basis apparent from the record.  See Fabiano v. Hopkins, 352 F.3d 447, 452 (1st Cir. 2003).  Although the district court granted summary judgment because Alberty failed to present evidence of unlawful discrimination, we resolve the matter on the threshold question of employee/independent contractor status.  See supra at n.4.[5]

### III. Analysis

Title VII protects employees from discrimination based on pregnancy and gender.  See 42 U.S.C. § 2000e(k); Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 277 (1987).  The statute

---

[5]We reject Alberty's contention that, because the district court initially granted partial summary judgment declaring Alberty an employee of WIPR, the magistrate judge to whom the case was reassigned could not reconsider this ruling later in the litigation.  A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial.  See Fed. Deposit Ins. Corp. v. Massingill, 24 F.3d 768, 774 (5th Cir. 1994); Deimer v. Cincinnati Sub-Zero Prods., Inc., 990 F.2d 342, 345-46 (7th Cir. 1993).  A district court "retains jurisdiction to modify a [Rule 56(d)] order at any time."  Alberty-Vélez I, 242 F.3d at 422 (citing 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure, § 2737 (3d ed. 1998)).  However, if a district court revisits a partial summary judgment order, it must "inform the parties and give them an opportunity to present evidence relating to the newly revived issue."  Id. (quoting Leddy v. Standard Drywall, Inc., 875 F.2d 383, 386 (2d Cir. 1989)).  Alberty received adequate notice that the magistrate judge intended to revisit the employee status issue prior to its adjudication, and she was able to present evidence on the matter by responding to WIPR's summary judgment motion.

defines an "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). This definition "is completely circular and explains nothing." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); Alberty-Vélez I, 242 F.3d at 421. However, it is now clear that it does not cover independent contractors. See Dykes v. DePuy, Inc., 140 F.3d 31, 37 n.6 (1st Cir. 1998). Thus, an independent contractor may not maintain a Title VII action against the entity with which she contracts. See Alexander v. Rush North Med. Ctr., 101 F.3d 487, 492 (7th Cir. 1996); Barbara Lindeman & Paul Grossman, Employment Discrimination Law, 1284 (3d ed. 1996)

This circuit has yet to identify the test to apply to determine whether an individual meets Title VII's definition of "employee." Relying on Darden, we have applied the "common law agency test" in cases arising under other federal anti-discrimination statutes containing the same definition of "employee" as Title VII.[6] See Dykes, 140 F.3d at 38 (applying common law test under Americans with Disabilities Act); Speen v. Crown Clothing Corp., 102 F.3d 625, 631 (1st Cir. 1998) (applying common law test under ERISA and Age Discrimination Employment Act). We see no reason to apply a different test under Title VII and

---

[6]Darden held that the common law agency test applies to identify employees under ERISA, which, like Title VII, defines employee as "any individual employed by an employer." 503 U.S. at 323.

therefore will apply the common law test to determine whether Alberty was WIPR's employee or an independent contractor. See, e.g., Farlow v. Wachovia Bank of N.C., 259 F.3d 309, 313-14 (4th Cir. 2001) (applying common law agency test in Title VII case); Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 113-14 (2d Cir. 2000) (same). See also Employment Discrimination Law, supra at 908 (3d ed. 2002 supp.) (stating that after "Darden most courts have utilized a common law agency test to determine whether a plaintiff is an employee under Title VII").

Under the common law test, a court must consider:

> the hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Dykes, 140 F.3d at 37-38 (quoting Darden, 503 U.S. at 323-24). "The test provides 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being

-9-

decisive.'"  <u>Id.</u> at 37 (quoting <u>Darden</u>, 503 U.S. at 324).[7] However, in most situations, the extent to which the hiring party controls "the manner and means" by which the worker completes her tasks will be the most important factor in the analysis.  <u>See</u> <u>Eisenberg</u>, 237 F.3d at 114 (citing cases).

At oral argument, Alberty conceded that there were no disputed issues of material fact concerning employment status.  In such a case, a court may decide the employee/independent contractor question as a matter of law if the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion.  <u>See</u> <u>Dykes</u>, 140 F.3d at 38-39 (affirming grant of summary judgment concluding individual was independent contractor); <u>Speen</u>, 102 F.3d at 634 (affirming grant of judgment as a matter of law concluding individual was independent contractor).

Several factors favor classifying Alberty as an independent contractor.  First, a television actress is a skilled position requiring talent and training not available on-the-job.  <u>Cf.</u> <u>Aymes</u> v. <u>Bonelli</u>, 980 F.2d 857, 862 (2d Cir. 1992) ("courts that have addressed the level of skill necessary to indicate that

_____

[7]A court must tailor these factors to the relationship at issue.  Often certain factors will not be relevant to a particular case, and a court should not consider them as favoring either side. <u>See</u> <u>Eisenberg</u>, 237 F.3d at 114.  In this case, the parties present no evidence concerning Alberty's role, if any, in hiring and paying assistants.  Therefore, we will not consider it.

-10-

a party is an independent contractor have held . . . architects, photographers, . . . artists, [and] drafters . . . to be highly skilled independent contractors") (citing cases). In this regard, Alberty possesses a master's degree in public communications and journalism; is trained in dance, singing, and modeling; taught within the drama department at the University of Puerto Rico; and acted in several theater and television productions prior to her affiliation with "Desde Mi Pueblo."

Second, Alberty provided the "tools and instrumentalities" necessary for her to perform. Specifically, she provided, or obtained sponsors to provide, the costumes, jewelry, and other image-related supplies and services necessary for her appearance.[8]

Alberty disputes that this factor favors independent contractor status because WIPR provided the "equipment necessary to tape the show." Alberty's argument is misplaced. The equipment necessary for Alberty to conduct her job as host of "Desde Mi Pueblo" related to her appearance on the show. Others provided equipment for filming and producing the show, but these

---

[8] That WIPR reserved the right to approve Alberty's sponsors does not alter this conclusion. A company may require that it provide prior approval before an independent contractor takes an action or associates with an entity that could reflect poorly on the company. Cf. Oestman v. National Farmers Union Ins. Co., 958 F.2d 303, 306 (10th Cir. 1992) (stating that requiring insurance agent to submit advertisements for pre-approval is not necessarily indicative of employee status because company has "substantial interest" in advertising reflecting company standards, even if issued by independent contractor).

were not the primary tools that Alberty used to perform her particular function. If we accepted this argument, independent contractors could never work on collaborative projects because other individuals often provide the equipment required for different aspects of the collaboration. See Hanson v. Friends of Minnesota Sinfonia, 181 F. Supp. 2d 1003, 1008 (D. Minn. 2002) (stating that independent-contractor musician provided "instrumentalities and tools" by providing instrument, even though symphony provided musical scores, rehearsal facilities, music stands, and concert schedules), aff'd sub nom. Lerohl v. Friends of Minnesota Sinfonia, 322 F.3d 486 (8th Cir. 2003), cert. denied 124 S.Ct. 469 (2003).

Third, WIPR could not assign Alberty work in addition to filming "Desde Mi Pueblo." Alberty's contracts with WIPR specifically provided that WIPR hired her "professional services as Hostess for the Program Desde Mi Pueblo." There is no evidence that WIPR assigned Alberty tasks in addition to work related to these tapings. To be sure, Alberty did other work for WIPR by taping episodes of "Será Acaso Este Su Caso"; however, for these engagements, she signed separate contracts and received separate remuneration.

Fourth, the method of payment favors independent contractor status. Alberty received a lump sum fee for each episode. Her compensation was based on completing the filming, not

-12-

the time consumed.  If she did not film an episode she did not get paid.  See Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 753 (1989) (pay for "completion of a specific job [is] a method by which independent contractors are often compensated") (quoting Holt v. Winpisinger, 811 F.2d 1532, 1540 (D.C. Cir. 1987)).

Fifth, WIPR did not provide Alberty with benefits.  She did not receive paid leave, health insurance, life insurance, or retirement benefits from WIPR.[9]  See, e.g., Farlow, 259 F.3d at 315 (stating that lack of benefits indicates independent contractor status); Aymes, 980 F.2d at 862 (same).

Sixth, Alberty's tax treatment suggests independent contractor status.  Both she and WIPR classified her income as deriving from professional services rendered rather than wages earned.  See Dykes, 140 F.3d at 38; Speen, 102 F.3d 633.

Despite these factors favoring independent contractor status, Alberty argues that she was WIPR's employee because WIPR controlled the manner of her work by directing her during filming, dictated the location of her work by selecting the filming sites, and determined the hours of her work by requiring her to be on-call

---

[9]Alberty disputes this factor by arguing that, on one occasion, WIPR paid her, even though she could not complete an episode because of a death in her family. While Alberty tries to paint this as a general benefit, she identifies no evidence suggesting that this was anything but a single occurrence.  Further, her other testimony contradicts her assertion that there was a policy to pay her when she could not film.  As she stated several times, if she did not film an episode she did not get paid.

during filming days.  While  "control" over the manner, location, and hours of work is often critical to the independent contractor/employee analysis, it must be considered in light of the work performed and the industry at issue.  See Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 260 (4th Cir. 1997).  Considering the tasks that an actor performs, we do not believe that the sort of control identified by Alberty necessarily indicates employee status.

A recent Eighth Circuit case illustrates the point.  See Lerohl 322 F.3d 486.  In Lerohl, the court considered the employment status of two "regular" musicians in the Minnesota Sinfonia.  Id. at 489.  The musicians argued that they were employees because the conductor selected the music, scheduled the rehearsals and concerts, and determined the manner in which the music would be played.  Id. at 490.  The court "emphatically" rejected the argument that the "control" exercised by the conductor necessarily demonstrated the musicians' employee status because "work by independent contractors is often performed to the exacting specifications of the hiring party."  Id.  Musicians participating in an orchestra are, by necessity, subject to the control and scheduling of the conductor because such control allows the symphony to perform as a single unit.  See id.  The court concluded that, in these circumstances, the relevant control issue was not whether the conductor could instruct the musicians "where to sit

-14-

and when to play" but whether the musicians retained the discretion to decline to participate in Sinfonia concerts and to play elsewhere. Id. at 491.

We think that a similar analysis is apt here. Alberty's work on "Desde Mi Pueblo" required her to film at the featured sites at the required times and to follow the instructions of the director. WIPR could only achieve its goal of producing its program by having Alberty follow these directions. Just as an orchestra musician is subject to the control of the conductor during concerts and rehearsals, an actor is subject to the control of the director during filming. To hold that this sort of control determines Alberty's status would defy "common sense" as it would result in classifying all actors as employees, regardless of the other aspects of the relationship. Lerohl, 322 F.3d at 490; see also Reid, 490 U.S. at 752-53 (sculptor was independent contractor even though association that hired him defined scene to be sculpted and specified most details of sculpture's appearance including its scale and materials to be used); Powell-Ross v. All Star Radio, Inc., 68 Fair Empl. Prac. Cases 1148, 1153-54 (E.D. Pa. 1995) (radio disk jockey was independent contractor under Title VII even though station required disk jockey to appear at station to perform show at certain times).[10]

_____

[10]To further understand our conclusion on the control factor, it may be useful to distinguish the Second Circuit's decision in Eisenberg. See 237 F.3d 111. There, the court held that control

-15-

Like the musicians in Lerohl, who could decline to play in future concerts, Alberty could decline to host future "Desde Mi Pueblo" episodes by refusing to sign additional contracts. It is undisputed that "Alberty did not have any contractual obligation to continue working with WIPR and WIPR had no contractual obligation to continue renewing her contracts." Thus, under the parties' arrangement, Alberty controlled the extent to which she wished to commit her professional time to filming "Desde Mi Pueblo." See Lerohl, 322 F.3d at 492.

In addition to control over the manner, location and time of the work, Alberty emphasizes additional facts which she claims favor employee status. First, she argues that, as a matter of "economic reality," she was an employee of WIPR because this is the entity from which she derived most of her income. Some courts have applied an "economic reality test" to determine employee status

_____

was the dispositive factor in determining that the plaintiff furniture movers were employees, even though the movers did not receive W-2 Forms and were ineligible for benefits. The movers in Eisenberg were hourly, full-time warehouse workers. See id. at 113. The Eisenberg court recognized that the movers held positions typically occupied by employees but that the employer had manipulated the benefits and tax treatment factors to favor independent contractor status. See id. at 119. It refused to allow such manipulation to cloud the essential employee-character of the movers' position. See id. Here, there is no evidence of similar factor manipulation by WIPR. Alberty was a free-lance professional who was subject to only minimal control. That most of the other factors (e.g., method of payment, lack of benefits, tax treatment) favor independent contractor status is consistent with the limited control exercised by WIPR. See Lerohl, 322 F.3d at 492 (distinguishing Eisenberg on similar basis).

-16-

under Title VII.  See Armbruster v. Quinn, 711 F.2d 1332, 1340 (6th Cir. 1983).  Under this test, "employees are those who as a matter of economic reality are dependent upon the business to which they render service."  Bartels v. Birmingham, 332 U.S. 126, 130 (1947).  Other courts have applied a so-called "hybrid test" in which employee status is determined by measuring the economic reality of the relationship as well as the common law factors.  See Nowlin v. Resolution Trust Corp., 33 F.3d 498, 505-06 (5th Cir. 1994).  In Speen, we declined to apply either of these tests, instead focusing solely on the common law test.  See 102 F.3d at 632.  Because the common law test does not consider "economic reality" to be an indicator of employee status, the fact that Alberty's income derived primarily from WIPR does not weigh heavily in favor of employee status.

Second, Alberty contends that we should consider the Puerto Rico Department of Labor's determination that she was an "employee" eligible for unemployment compensation as indicating employee status under Title VII.  Determining employee status under Title VII is a matter of federal law.  See Alberty-Vélez I, 242 F.3d at 421.  As such, Alberty's status as an employee for purposes of the Puerto Rico unemployment compensation system is irrelevant to this analysis.  See Serapion, 119 F.3d at 988-89 (concluding individual's status as employee under Puerto Rico law is irrelevant to determining whether individual is employee under Title VII).

-17-

Third, Alberty contends that her sixteen-month relationship with WIPR favors classifying her as an employee. Our cases do not support her assertion. In Dykes, the parties' six-year relationship did not alter our conclusion that the plaintiff was an independent contractor. See 140 F.3d at 34-36. And in Speen, we determined that the plaintiff was an independent contractor despite the parties' twenty-year relationship. See 102 F.3d at 627. Given this precedent, we do not think that a sixteen-month relationship implies employee status.

Finally, Alberty argues that the facts that WIPR is in business and that her work on "Desde Mi Pueblo" was part of WIPR's business as a television station favor employee status. We agree with Alberty. Under the common law test, these facts support her claim of employee status.

While no one factor is dispositive, it is clear, based on the parties' entire relationship, that a reasonable fact finder could only conclude that Alberty was an independent contractor. The parties structured their relationship through the use of set length contracts that permitted Alberty the freedom to pursue other opportunities and assured WIPR that it would not have to pay Alberty for the weeks that it was not filming. See Worth v. Tyer, 276 F.3d 249, 264 (7th Cir. 2001) (noting that "[c]ontracts of a set length often indicate independent contractor status"). Further, the lack

of benefits, the method of payment, and the parties' own description of their relationship in tax documents all indicate independent contractor status. Alberty's "per-job" arrangement with WIPR is typical of an independent contractor, and we cannot disregard the parties' decision to choose this form of relationship simply because it deprives Alberty of Title VII protection. Alberty has not identified any case law suggesting a different conclusion.[11] Accordingly, we conclude that Alberty was an independent contractor as a matter of law and therefore cannot maintain a Title VII action against WIPR.[12]

## IV. Conclusion

For the reasons stated above, we **affirm** the judgment of the district court.

---

[11]Alberty's reliance on <u>Diana</u> v. <u>Schlosser</u>, 20 F. Supp. 2d 348, 350-52 (D. Conn. 1998) is misplaced. In that case, the court permitted an on-air traffic reporter to maintain a Title VII action against a radio broadcaster because, even though the broadcaster did not employ the reporter, the broadcaster exercised significant control over the reporter's ability to obtain other employment opportunities. Alberty has not demonstrated that WIPR maintained this sort of control over other employment opportunities available to her.

[12]Citing <u>Fernández v. A.T.P.R.</u>, 104 D.P.R. 464, 465 (1975), Alberty acknowledges that a similar analysis determines whether she is an employee covered under Puerto Rico's anti-discrimination laws. Because Alberty has not argued for a different conclusion under Puerto Rico law, our conclusion that Alberty is an independent contractor for purposes of Title VII also disposes of her Puerto Rico law claims.