Michael M. v. Pemi-Baker School          CV-02-541-SM  08/31/04
                   UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW HAMPSHIRE


Michael D. M., parent and
next friend of Michael M.,
       Plaintiff

       v.                                  Civil No. 02-541-SM
                                           Opinion No. 2004 DNH 128
Pemi-Baker Regional School District,
       Defendant


                          **O R D E R**


       This is one of at least three federal cases in which Michael

M., by his parents, appeals an educational hearing officer's

decision in favor of a school district.  See 20 U.S.C. §

1415(i)(2).  See also Michael M. v. Pemi-Baker Regional Sch.

Dist., No. 04-124-SM (D.N.H.); Michael M. v. Plymouth Sch. Dist.,

No. 01-469-SM (D.N.H.).  Currently before the court are the

parties' respective decision memoranda and statements of material

facts.  Neither party requested a hearing to present oral

argument or additional evidence.  The matter is, then, ready for

resolution.

## Background

The general factual background is fully described in the court's recent order in <u>Michael M. v. Plymouth Sch. Dist.</u>, No. 01-469-SM, 2004 DNH 64 (April 12, 2004 D.N.H.) ("<u>Michael I</u>"). Those facts relevant to the disposition of this matter are discussed as appropriate.

Michael M. was born on June 8, 1987, and is now 17 years old. He is exceptionally bright (at least one series of testing indicates that he has an I.Q. in the 140 range) and nearly all of his academic grades appear to be A's or B's. He plans to attend college and has expressed interest in becoming an attorney - goals that at least one of his examining doctors (Dr. Sarah Brophy) considers well within his reach. <u>See</u> <u>Michael I</u>, <u>supra</u>. He does, however, suffer from some learning disabilities. He has been diagnosed with attention deficit and hyperactivity disorder ("ADHD"), which resulted in a coding of "Other Health Impaired." He also has difficulty with penmanship, due to poor fine motor skills, and deficits in expressing ideas in written form, resulting in a coding of "Learning Disabled." Because of his

2

disabilities, he has been receiving special educational services for several years.

In June of 2002, when Michael's father requested a due process hearing before the New Hampshire Department of Education, Michael had just completed the ninth grade during the 2001-2002 academic year at Plymouth Regional High School. Michael's IEP for that year was the result of an August 20, 2001 due process hearing decision, which this court affirmed in Michael I. During the course of that academic year, Michael achieved substantial academic success, notwithstanding the fact that he was enrolled in one academic course more than is normally recommended for students in ninth grade, and despite the fact that two of those courses were at the "honors" level. He received a grade of "B" or better in all subjects, except the two honor courses in which he was enrolled (Honors English, in which he received a grade of 78, and Honors Algebra, in which he received a grade of 79). While some of his second quarter grades did suffer somewhat, that decline in academic performance seems to have been largely related to his having missed six school days during a six-week period in that quarter because of his extra-curricular

3

participation on the ski team.  He also had three other all-day absences during that period.  Having missed nearly two full weeks of school during that six-week quarter, the modest downturn in his academic performance is hardly surprising.  Once the ski season ended, his academic performance appears to have rebounded nicely.

Overall, Michael's academic performance was at least average and, in some cases, well above average.  His academic progress during that year was appropriate.  Additionally, he performed exceedingly well on several standardized tests that were administered during that school year.  For example, on the national "Explore" test, which is given to all ninth graders, Michael's overall English score placed him in the 96th percentile locally and the 95th percentile nationally.  In mathematics, his score placed him in the 98th percentile locally and the 94th percentile nationally.  In Reading, he ranked in the 96th percentile locally, and the 98th percentile nationally.  Of particular significance, given Michael's disabilities, were his test results in English usage and mechanics (ranked in the 94th percentile locally and 95th percentile nationally) and rhetorical

4

skills (ranked in the 98th percentile locally and 94th percentile nationally). Results on other standardized tests, including the Oral and Written Language Scales (also known as "OWLS," on which Michael scored in the 99th percentile), and the TOWL-3 test, were similarly positive.

Nevertheless, in their request for a due process hearing, Michael's parents asserted that the School District had not properly implemented Michael's IEP and, as a consequence, he was not making appropriate academic progress. See Hearing Officer Decision dated July 22, 2002 at 1. Additionally, Michael's parents alleged that the School District had committed 18 different procedural violations. Id. at 2.

Following a two-day hearing, during which six witnesses testified, the hearing officer issued his written decision. In it, he concluded that Michael's parents had failed to demonstrate that the School District committed any procedural violations, and, even assuming violations occurred, that neither Michael nor the parents were prejudiced by them. Id. at 2-8. With regard to

5

the parents' substantive claims, the hearing officer ruled in favor of the School District, concluding:

> The District has submitted credible evidence of the appropriate implementation of the 2001-2002 IEP, with regard to the goal of making [Michael] a more independent learner, and to the goals of addressing [Michael's] need for greater skills in written expression and organization. There was no proof that teachers in English, Math and Science, or any other teacher, did not follow the IEP. There was insufficient proof to find that the District should have added certain items to the IEP during the school year. There was no requirement in the IEP that technology education or a technology assessment be provided to [Michael] during the school year. While the provision of directed technology education may have helped [Michael], there was no evidence [Michael's] IEP required this, and indeed [Michael] might not have had the time for an additional subject. The evidence shows, by a preponderance of the evidence, that [Michael] made educational progress during the 2001-2002 school year. The District is the prevailing party.

Id. at 17. Michael's father, proceeding pro se, filed this timely appeal.

### Legal Framework and Judicial Standard of Review

Congress enacted the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., "to ensure that all children with disabilities have available to them a free

6

appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). Under the scheme established by the IDEA, and in return for federal funding, state educational agencies establish procedures to identify and evaluate disabled students in need of special education services. See 20 U.S.C. § 1412. For each identified child, a team comprised of the child's parents, teachers, and a representative of the educational agency develops an individualized education plan ("IEP") for the child.

An IEP consists of "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of [the IDEA]." 20 U.S.C. § 1401(11). It must be "reasonably calculated to enable the child to receive educational benefits," Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982), and "custom tailored to address the [disabled] child's 'unique needs,'" Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993) (citing 20 U.S.C. § 1400(c)).

Importantly, however, neither the IDEA nor New Hampshire law requires an IEP to "maximize" a child's educational benefits. See, e.g., Lenn, 998 F.2d at 1086 (holding that federal law does not require that "the benefit conferred [by the IEP] reach the highest attainable level or even the level needed to maximize the child's potential."). Instead, the IDEA establishes more modest goals and imposes on states and local school districts an obligation to provide a program that is "sufficient to confer some educational benefit upon the handicapped child." Rowley, 458 U.S. at 200.

> We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.

Id. at 201. Notwithstanding Michael's parents' assertions to the contrary, see Parents' Decision Memorandum (document no. 43) at 2-3, Rowley remains good law and sets forth the standard by which a School District's compliance with the IDEA is measured. See, e.g., Lt. T.B. ex rel. N.B. v. Warwick Sch. Com., 361 F.3d 80, 83 (1st Cir. 2004).

If a parent believes that a proposed IEP will not provide an appropriate education, or that the procedures established by the IDEA have not been properly followed in developing the IEP, he or she may request an administrative due process hearing to review the matter.  See 20 U.S.C. § 1415(f).  If a parent or the affected school district is dissatisfied with the administrative hearing officer's ruling, that party may seek judicial review in either state or federal court.  20 U.S.C. § 1415(i)(2).

The district court's review of state educational administrative proceedings has been described as "one of involved oversight."  Lenn, 998 F.2d at 1087 (citing Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)).  The applicable standard is an intermediate one under which the district court must exercise independent judgment, but, at the same time, accord "due weight" to the administrative proceedings.

> The required perscrutation must, at one and the same time, be thorough yet deferential, recognizing the expertise of the administrative agency, considering the agency's findings carefully and endeavoring to respond to the hearing officer's resolution of each material issue.  Jurists are not trained, practicing educators.  Thus, the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to

prevent judges from imposing their view of preferable educational methods upon the States.

Roland M., 910 F.2d at 989 (citations and internal punctuation omitted).  See also T.B. v. Warwick Sch. Comm., 361 F.3d at 83-84.

District court review is focused on two questions: (1) whether the parties complied with the procedural requirements of the IDEA; and (2) whether the IEP developed through those procedures was reasonably calculated to enable the disabled child to receive educational benefits.  See, e.g., Rowley, 458 U.S. at 206-07.  The burden of proof rests with the party challenging the administrative decision - here, Michael's father.  See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992); Roland M., 910 F.2d at 991.

## Discussion

In his complaint, Michael's father challenges the hearing officer's decision on eleven separate grounds.  Amended complaint (document no. 28) at paras. 6(A) through 6(K).  In his decision

memorandum, the father describes his challenges as falling into three categories:

> The Parents' complaints can be group[ed] into three areas, failure to progress, school district action and the hearing officer's action. The allegations are that the law requires a broad view of the areas to be measured for progress which was not done. Secondly, the school district's procedural violations were contrary to the law, the State has a responsibility to monitor compliance with the law and the hearing officer an obligation to rule on them. Lastly, the hearing officer's actions were prejudicial and affected the out come of the hearing.

Parent's decision memorandum (document no. 43) at 1. As was the case in Michael I, none of the father's arguments has merit.

I. Alleged Procedural Errors.

The nature of the complaint regarding procedural errors is not entirely clear. Michael's father seems to suggest that the hearing officer erred by concluding that not one of the alleged procedural errors (even if credited as true) had any substantive adverse impact on the parents' ability to meaningfully participate in the formulation (and monitoring) of Michael's IEP, without first determining whether the alleged procedural error(s) actually occurred.

11

When a Due Process Hearing alleges procedural safeguards under IDEA, the hearings officer has a duty to determine first if they occurred and secondly, their impact. As violations brought and decided at a Due Process can not subsequently be brought under the State Agencies complaint mechanism, the Hearing Officer must determine if the violations are factual. In this case the Hearing Officer found no harm but often avoided a determination of violation.

Parent's decision memorandum at 7.

The argument seems to be based upon a misunderstanding of the significance of procedural errors in the IDEA context. The mere existence of a procedural error on the part of a school district does not automatically entitle a parent or disabled student to some form of relief; some procedural errors do not result in any substantive harm.

Courts must strictly scrutinize IEPs to ensure their procedural integrity. Strictness, however, must be tempered by considerations of fairness and practicality: procedural flaws do not automatically render an IEP legally defective. Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.

12

Roland M., 910 F.2d at 994.  Here, there is no evidence that any

of 18 alleged procedural errors identified by Michael's father

compromised Michael's right to an appropriate education,

seriously hampered his parents' opportunity to participate in the

formulation or monitoring of his IEP, or deprived Michael of any

educational benefits.


II.  Michael's Alleged Failure to Progress.

With regard to the claim that Michael did not make adequate

educational progress during the academic year, his father says:

> Mike's grades would have been "F's" if he did not
> produce multiple drafts at the direction of the special
> education teacher with exactly what needed to be done
> to make it better.  The school was unable to
> successfully demonstrate evidence of progress.  They
> used progress reports from the program provider to
> state that progress had been made, but no proof was
> offered.  The school offered post [national
> standardized] testing as evidence, but when a service
> provider in an adversarial situation is also the
> examiner, this is usually viewed as biased testing and
> borders on unethical.  The school provided report card
> grades, but it was made clear at this Due Process that
> most if not all of Michael's work was completed with
> prompting, teacher input, and great efforts on Mrs.
> Lambert's part to make sure the grades were good.  Mike
> did not earn these grades independently and therefor[e]
> [they] are not a good reflection of the progress he
> made.

13

Parent's decision memorandum at 6.  Of course, the fact that Michael did not progress at the rate expected by his parents is not evidence that he failed to make adequate educational progress.  Nor is it evidence of the School District's failure to properly implement Michael's IEP.  Michael is a special needs student with an IEP; it is, therefore, not surprising that his work is reviewed by his teachers, nor is it unusual (or inappropriate) that he is given special instruction and direction aimed at improving his academic work.

The record in this case demonstrates that Michael made adequate educational progress during the 2001-2002 academic year.  Indeed, he did quite well, given that: (1) he was enrolled in more courses than the School District recommended (two of which were honors-level courses); (2) one of his courses involved the study of a foreign language, which is generally not recommended for students at Michael's grade level; and (3) his participation on the ski team during the winter caused him to be absent from school far more often than was probably appropriate for a special needs student.

14

Further complicating the School District's efforts to provide Michael with a free appropriate public education was the parents' resistance to assuming an active role at home in monitoring Michael's school work and prompting him to do his homework. See, e.g., 2001-2002 IEP at 9 ("The parents request that the struggles and frustrations accompanying Michael's work are to be kept between [him] and the school. The family is to be provided information but is not to be put in the middle."); Hearings Officer's Decision at 14 ("The evidence shows that Parents demanded that they not be meaningful participants in enforcing homework production efforts."). See also Testimony of Michael's mother, Day Two of Due Process Hearing, transcript at 198-200. The parents also opposed providing the School District with meaningful authority to enforce Michael's responsibilities under the IEP by, for example, strictly prohibiting the School District from reducing or eliminating Michael's participation on the ski team if he failed to do his homework.

Little more need be said about the assertion that Michael did not make adequate educational progress. The record evidence overwhelming contradicts that claim. While Michael may not have

15

advanced as quickly or as far as his parents would have liked, that is not the standard by which his educational progress is measured under the IDEA. Here, the record reveals that, notwithstanding a decidedly adversarial posture adopted by the parents - particularly Michael's father (the record, for example, contains suggestions that Michael's father made efforts to have two special educators fired, filed a defamation suit against some School District employees, and filed a discrimination claim against the School District with the U.S. Department of Education, Office for Civil Rights) - the School District still devoted substantial time, effort, and resources to ensure that Michael's IEP was properly implemented, and that he made adequate educational progress. It was and he did.

III. <u>Alleged Factual Errors Made by the Hearing Officer</u>.

Finally, Michael's father takes issue with several factual findings and/or statements made by the hearing officer in his written decision, claiming that they are inaccurate and indicate a bias on the part of the hearing officer. The court disagrees.

To be sure, the hearing officer's written decision is, in places, directly critical of Michael's parents.[1] That criticism is, however, supported by the record. So, for example, in describing the substance of the evidence presented by Michael's father, and the manner in which it was presented, the hearing officer made the following observation:

> Parents' case consisted of cross-examination of District witnesses on aspects of Student's 2001-2002 school year and argument. The cross-examination did not reveal deficiencies in the educational program. Cross-examination exposed the barriers and difficulties posed by Father's active opposition to the District's efforts to provide Student a FAPE so he could make appropriate educational progress. Father's priority based on the evidence presented, was to actively oppose the District effort to constructively engage in a joint effort to appropriately educate Student.

---

[1] For example, Michael's father takes issue with the hearing officer's description of the School District's effort to schedule meetings with the parents and accommodate their schedule as "herculean." Decision at 4. He also claims the hearing officer "discounted" the testimony given by Michael's mother by noting that "parent's presented no independent analysis of Student's progress." Presumably, by using the word "independent," the hearing officer meant a neutral, impartial party not related to Michael; that comment does not reflect any bias against Michael's mother. Additionally, Michael's father points out that the hearing officer noted that "there was no appeal of the decision in [the prior due process hearing]," when the parents had, in fact, appealed. Importantly, however, the hearing officer attributed that statement to Michael's father ("Parent stated during the current due process hearing that there was no appeal of the decision in [the prior due process hearing].").

17

> Father's testimony indicated that he had the School
> District representative served with a Complaint in the
> U.S. District Court for the District of New Hampshire.
> Father offered no explanation for any constructive
> purpose in sending a Complaint to School District
> staff, while not filing the same with the Clerk. A
> reasonable assumption in the context of the other facts
> of this case would be, solely bad faith. . . . Except
> for the volume of written material generated by Father
> in the exhibits, Father's involvement with the IEP
> team, by testimony of District witnesses, appears to
> have been reasonably calculated to be as nonproductive
> as possible.

Hearing Officer Decision at 15-16. The hearing officer's

decision is unmistakably critical of Michael's father, but with

apparent good cause. His expressed view of the father's behavior

is grounded in his reasonable and rational interpretation of both

the testimonial and written evidence before him. That

interpretation of the evidence does not demonstrate "bias"

against Michael's father, but merely the reality permeating this

parent's energetic but inexplicable quest for something plainly

not available under the IDEA.

The hearing officer's critical tone is, no doubt, rooted in

his familiarity with the School District's efforts to educate

Michael (the same hearing officer presided over the parents'

earlier due process hearings) and a legitimate sense of frustration arising from the parents' apparent refusal to work cooperatively with the School District to establish (and achieve) reasonable goals for Michael, as well as the father's well-documented adversarial behavior and litigiousness.

There is no evidence that the hearing officer was anything but impartial in considering this matter and nothing in the record suggests he was biased against either of the parents or, more importantly, Michael. If anything, the record discloses a hearing officer who considered the evidence and issues in a professional manner, and with great patience under trying circumstances. The record evidence more than adequately supports the hearing officer's conclusion that, during the 2001-2002 academic year, Michael's IEP was properly implemented and he made adequate educational progress.

## Conclusion

Under the Supreme Court's decision in Rowley, the "IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." T.B. v. Warwick Sch. Comm., 361 F.3d at 83 (citations omitted). Consequently, the IDEA does not impose upon the School District the obligation to devise the best possible IEP for Michael, nor does it require the School District to flawlessly implement Michael's IEP, nor does it require the School District to provide what the parents might consider an ideal education.

> The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

Lenn, 998 F.2d at 1086.

20

Michael's parents are, no doubt, motivated by what they believe is best for Michael.  And, perhaps Michael's father believes that by adopting an aggressively confrontational approach to the School District he might eventually force the School District to capitulate to his demand that Michael be placed in a private school (previously, the parents expressed a desire to place Michael in Waterville Valley Academy, a well-known ski school that provides students with tutoring on academic subjects while stressing advancement in skiing skills, and, more recently, they sought to have him placed at the New Hampton School or the Holderness School, private preparatory schools to which Michael was admitted).  It is, of course, impossible to know for certain.  But, it is clear from the record that Michael's parents have made it very difficult (and expensive) for the School District to honor its reasonable obligations to Michael under the IDEA.  The District has, nevertheless, done so, and should be commended.

For the foregoing reasons, as well as those set forth in the School District's Decision Memorandum (document no. 42) and its Reply Memorandum (document no. 45), the decision of the hearing

21

officer dated July 22, 2002, is affirmed in all respects.  The School District is the prevailing party.  Each party shall bear its own costs and expenses.  The Clerk of Court shall enter judgment in favor of the School District and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

August 31, 2004

cc:  Michael D. M., pro se
     Diane M. Garrow, Esq.