**NOT FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**FILED**

NOV 28 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: HEWLETT-PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION, _____ STANLEY MORRICAL,           Plaintiff-Appellee, A. J. COPELAND,           Objector-Appellant,   v. HEWLETT-PACKARD COMPANY; et al.,           Defendants-Appellees, VINCENT HO,     Intervenor-Defendant-    Appellee. | No. 15-16688 D.C. No. 3:12-cv-06003-CRB MEMORANDUM[*] |
| In re: HEWLETT-PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION, _____ | No. 15-16690 D.C. No. 3:12-cv-06003-CRB |

      [*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

STANLEY MORRICAL,

        Plaintiff-Appellee,

HARRIET STEINBERG,

        Objector-Appellant,

  v.

HEWLETT-PACKARD COMPANY; et al.,

        Defendants-Appellees,

VINCENT HO,

        Intervenor-Defendant-
        Appellee.

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted May 15, 2017
San Francisco, California

Before:  McKEOWN and MURGUIA, Circuit Judges, and RUFE,[**] District Judge.

In this shareholder derivative suit, we review a settlement agreement that included corporate governance reforms but no monetary compensation for shareholders.  After careful scrutiny of the settlement negotiations and terms, we

---

[**]    The Honorable Cynthia M. Rufe, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

conclude that the district court did not abuse its discretion in approving the settlement.

This appeal stems from Hewlett-Packard Company's ("HP") failed acquisition of Autonomy Corporation ("Autonomy"). As the parties are familiar with the facts and history, we do not recount them here.

The district court must determine whether a proposed settlement is "fundamentally fair, adequate, and reasonable." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995) (citation omitted). The court may consider a range of factors, including the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, the amount offered in settlement, the stage of the proceedings, the experience and views of counsel, and the reaction of class members to the proposed settlement. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992) (citation omitted).

We review for abuse of discretion the district court's approval of the settlement, keeping in mind that we do not exalt our own notions of fairness over those of the district court and the parties, and recognizing the "strong judicial policy" in favor of settlement in complex cases. *See Pac. Enters.*, 47 F.3d at 377-78 (citation omitted). The district court is not required to respond to settlement objections with formal findings of fact and conclusions of law so long as it gives a "reasoned response" in the record. *Id.* at 377. The district court's explanation and

2

response here satisfied these standards, contrary to the claims by Harriet Steinberg and A.J. Copeland ("Objectors").

The district court held an extensive settlement hearing in which it responded to the claims raised by Objectors and explained why the settlement was fair. The court found that in the absence of settlement, the shareholders would have faced "a nearly insurmountable obstacle to get by a motion to dismiss." The court determined that the corporate governance reforms adopted in the settlement had the potential to "actually change governance in the operation of Hewlett-Packard," and that the reforms "were caused in part by this litigation." The court accepted the release clauses only after finding that the scope of liability had been "significantly and substantively narrowed," and after rejecting two prior proposed settlements. Finally, the court found "no evidence of fraud or collusion" in the negotiations.

The findings on the strength of the shareholders' claims were reasonable in light of the business judgment rule, which governs shareholder derivative lawsuits under Delaware law. *See Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (en banc). The Morrical shareholders did not make a demand on the HP Board before filing suit. Hence, their suit would be dismissed unless they could show that demand was futile by raising a reasonable doubt that "(1) the directors [were] disinterested and independent and (2) the challenged transaction was otherwise the

3

product of a valid exercise of business judgment." *Id*. at 814. The district court had the benefit of a voluminous record concerning the independence of HP's Board and HP's extensive due diligence on the Autonomy deal.

At the time suit was filed, the HP Board was comprised almost entirely of outside directors, and none benefitted personally from the Autonomy Transaction. The only three HP directors who participated in the decision to acquire Autonomy recused themselves from the Board's vote to accept the Demand Review Committee's ("DRC") recommendations; the rest took their seats after the acquisition was completed.

HP considered Autonomy as an acquisition target as early as 2006. Well before formal due diligence began, HP reviewed and stress-tested information from Autonomy's senior officers and investment bankers respecting the company's financial condition, operating results, technology, product development, gross margins, and distribution channels. HP's Corporate Development Group analyzed Autonomy's reported financial information and scrutinized reports on Autonomy's prospects from analysts, industry experts, and trade groups.

HP then expanded its team of outside advisors to include KPMG for accounting, Barclays for financial advice, Freshfields Bruckhaus Deringer for legal and tax advice, and Gibson Dunn & Crutcher as deal counsel. HP's transaction team had weeks of daily diligence calls with Autonomy. HP also had conference

calls with Deloitte, Autonomy's auditor, to inquire about revenue recognition, fraud, controlling, internal governance, and unadjusted audit differences. HP's Board ultimately received confirmation from the deal team that it obtained all "must have" diligence information. In the absence of settlement, the shareholders would have faced a difficult road indeed to prove that these efforts represented conduct "without the bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (citation omitted).

With respect to HP's outside directors, the shareholders were on even weaker ground. HP's corporate charter exempts outside directors from the duty of care. Hence, the shareholders would have had to show that the directors breached their duty of loyalty by "knowingly and completely fail[ing] to undertake their responsibilities." *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243–44 (Del. 2009) (en banc). The obstacles shareholders faced to maintain suit against HP's officers were only more daunting with respect to directors.

So too for HP's advisors. To establish liability, the shareholders needed to prove that the advisors knowingly aided and abetted a breach of fiduciary duty. *Malpiede v. Townson*, 780 A.2d 1075, 1096–97 (Del. 2001) (en banc). The shareholders would have been hard-pressed to do so given the extent of HP's diligence efforts and the high bar for establishing a breach of fiduciary duty. Further, "mere disagreement" with advisory performance is not sufficient to state

5

an aiding and abetting claim, nor to raise an inference that the directors did not act in good faith. *See Ironworkers Dist. Council of Phila. v. Andreotti*, 2015 WL 2270673, at *27 (Del. Ch. May 8, 2015), *aff'd*, 132 A.3d 748 (Del. 2016) (en banc).

The Objectors argue that their claims were stronger than Morrical's, because they submitted demand letters to HP's Board and thus were not required to show that a demand letter would have been futile. But the Objectors would still have had to rebut the strong presumption that the Board's decision not to take action was a valid exercise of its business judgment. *See, e.g.*, *Aronson*, 473 A.2d at 813.

Here, HP conducted an exhaustive investigation in the wake of the Autonomy debacle. The Board created a Demand Review Committee, which launched a 14-month investigation that included interviews of more than 90 individuals, current and former employees, officers, advisors and directors of HP and Autonomy. DRC counsel spent more than 34,000 hours collecting, reviewing, and analyzing relevant documents, witness interviews, and materials. DRC experts spent another 16,000 hours advising on accounting principles, economic analyses, and Delaware and English legal issues and standards.

The DRC concluded that HP's officers were not grossly negligent, and that HP should either settle the case or move to dismiss it. After the investigation, HP

provided Steinberg with a copy of the DRC's decision and a 1,300-slide presentation on its findings. Ultimately, the district court concluded that "the strength of the plaintiffs' case," and the "risk, expense, complexity, and likely duration of further litigation" weighed in favor of settlement. *See Class Plaintiffs*, 955 F.2d at 1291. It did not abuse its discretion in doing so.

Settlements involving nonmonetary provisions merit "careful scrutiny to ensure that these provisions have actual value to the class." *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944 (9th Cir. 2011) (citation omitted). The district court found that the "revisions to HP's mergers and acquisitions policies through the corporate governance reforms inure to the benefit of both HP entities," and that "the trade-off of Autonomy-related claims for corporate governance reforms appears fair, reasonable, and adequate." The record supports this finding. The reforms in the settlement set forth an extensive, detailed list of procedures for HP to follow in future mergers and acquisitions.

The settlement also gave shareholders the right to sue to enforce its terms, including the governance reforms – a right they would not have had absent the settlement. Objectors cite no authority for the proposition that, in order to have value, the consideration received by the shareholders must have prevented the original incident that precipitated the lawsuit. Nor is there an obligation to assign a monetary value to the reforms, as we "have never prescribed a particular formula"

by which a settlement must be tested. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

The district court found that this litigation at least "in part" caused the governance reforms that HP adopted. Delaware has recognized a "presumption that there is a causal relationship between" a timely filed lawsuit and a subsequently enacted reform or benefit. *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011, 1015 (Del. 2007) (en banc) (citation omitted). And benefits to a corporation that are "causally related to the [derivative] lawsuit" may serve as valid consideration for approval of a settlement. *Polk v. Good*, 507 A.2d 531, 538 (Del. 1986).

The court's finding that this litigation influenced HP's decision to adopt the corporate governance reforms was supported by the record. *See Pac. Enters.*, 47 F.3d at 378. HP acknowledged that the lawsuits were a contributing factor to the reforms. None of the reforms preexisted the settlement negotiations, and HP testified that plaintiffs' counsel was involved in proposing several of them.

The record supports the district court's conclusion that the settlement negotiations were not collusive. Retired Chief District Judge Vaughn R. Walker, an experienced judge, served as mediator. He conducted many mediation sessions between HP and the shareholders. He described the negotiations as "intense and detailed, involving skilled, seasoned professionals on both sides of the table," and

commented that "in the absence of a settlement, litigation of the issues would be time-consuming, burdensome, hotly contested, and expensive." After observing that HP adopted revisions to its mergers-and-acquisitions policies, he further stated that "the derivative actions . . . were instrumental in identifying the need for, devising and implementing valuable corporate governance reforms that are directly tailored to prevent the types of alleged breaches of fiduciary duty involved in large acquisitions" like the Autonomy deal. Judge Walker concluded that "the efforts, vigor and skills of counsel, together with their consultants and clients, [we]re unrivalled in [his] personal experience in negotiations of this kind."[1]

The district court did not abuse its discretion in approving the scope of the release. Objectors cite no circuit authority for their argument that a liability release can only encompass those defendants who made a concrete contribution to the settlement; indeed, we have acknowledged some authority to the contrary. *See Class Plaintiffs*, 955 F.2d at 1293 n.15 (citing cases).[2]

---

[1] Because Objectors presented no additional evidence of fraud or collusion, the district court did not abuse its discretion by affirming the magistrate judge's partial denial of Copeland's discovery requests. Discovery of settlement negotiations "is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive." *Lobatz v. U.S. W. Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000) (citation omitted).

[2] Objectors also argue that the district court did not specifically address their argument that the early stage of the proceedings counseled against approval of the settlement. But under Rule 23(e), there is no requirement that the district court address every conceivable factor in making its fairness determination. *See Class Plaintiffs*, 955 F.2d at 1291-92.

None of the objections to the notice of settlement have merit. Rule 23.1 simply states that notice of a proposed settlement of a shareholder derivative action "must be given to shareholders . . . in the manner that the court orders." Fed. R. Civ. P. 23.1(c). Objectors argue that the notice was deficient because it was not promulgated by direct mail, citing *Mullane v. Central Hanover Bank & Trust Company*, 339 U.S. 306 (1950). But *Mullane*, which concerned notice to beneficiaries of a common trust fund, required direct mail notice on due process grounds only where "practicable," and depending on the circumstances. *Id.* at 317.

Here, the district court found that HP's proposed notice procedures, which included placing notice of the settlement on two consecutive days in *The New York Times*, *Investor's Business Daily*, *The Wall Street Journal*, and *The San Francisco Chronicle*, filing an 8-K with the SEC, and publishing the notice on its website, were the "best procedures practicable under the circumstances, and provide[d] due and sufficient notice to all interested persons of all matters relating to the Settlement."

Most of Objectors' concerns amount to the argument that the notice did not contain every conceivable detail of the settlement. Such detail is not required; we have generally held notice to be satisfactory where it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d

10

566, 575 (9th Cir. 2004) (citation omitted). Here, the notice provided a summary of the litigation; the reasons for settlement; the settlement terms, including an overview of the proposed governance reforms; the effect of court approval of the settlement agreement on shareholders' rights; the attorneys' fees to be awarded; an explanation of a shareholder's right to object, the deadline for objecting, and the right to appear at the final approval hearing.

There was also sufficient time to lodge objections. More than three months elapsed between publication of the notice and the objection deadline; we have approved much shorter deadlines. *See, e.g.*, *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (approving a 31-day objection deadline in a shareholder class action settlement).

The district court did not abuse its discretion in keeping certain documents sealed following final judgment. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178-81 (9th Cir. 2006) (explaining that dispositive and non-dispositive judicial records and materials are treated differently). The district court adopted the special master's detailed consideration of whether HP's limited sealing motions should be granted. The special master found that HP provided compelling reasons to justify its sealing motion, including that the documents at issue included trade secrets, material protected by the attorney-client privilege and the work product doctrine, and confidential whistleblower information.

11

Finally, the district court did not abuse its discretion in declining to award attorneys' fees to Rodney Cook. Cook claims he conferred a substantial benefit on HP by influencing the district court's decision to order the removal of a retention agreement from the settlement. That position is belied by the district court's pointed finding that its decision on the removal order had "nothing to do" with Cook. The court elaborated: "[Cook] didn't bring it to my attention. I did it all by myself."

**AFFIRMED.**