**THE FUND FOR ANIMALS**
et al., Plaintiffs,

v.

Marshall JONES, Director, U.S.
Fish and Wildlife Service
et al., Defendants.

No. Civ.A. 982355(RMU).

United States District Court,
District of Columbia.

March 9, 2001.

Jonathan R. Lovvorn, Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Lori Caramanian, Jane P. Davenport, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for Federal Defendants.

Paul A. Lenzini, Special Assistant Attorney General, Alexandria, VA, for Intervenor Defendant.

## *MEMORANDUM OPINION*

URBINA, District Judge.

DENYING THE FEDERAL DEFENDANTS' MOTION TO DISMISS; DENYING THE INTERVENOR DEFENDANT'S MOTION TO DISMISS

### I. INTRODUCTION

This case involves nothing less than the history of the American West. In this chapter, the court addresses the delicate task of balancing environmental protection concerns with the stark fact that as time goes by, there is less and less room for the buffalo to roam.

The plaintiffs, the Fund for Animals and three individuals, have sued the United States Fish and Wildlife Service, the National Park Service, the United States Forest Service, the Department of the Interior, and the Department of Agriculture ("the federal defendants") to prevent them from, among other things, hunting bison.

The federal defendants oversee the federal lands at issue in this case. The State of Wyoming has intervened as a defendant. Both the defendants now move the court to dismiss this case as moot since the federal defendants voluntarily withdrew the proposed environmental plan that the court earlier found violated the National Environmental Policy Act ("NEPA"). The plaintiffs continue to assert violations despite the withdrawal of this plan, which is known as the Jackson Bison Herd Long Term Management Plan ("the Jackson Bison Plan"). For the reasons that follow, the court will deny the federal defendants' and the intervenor defendant's motions to dismiss.

### II. BACKGROUND

This case concerns the management of elk and the American bison located on federal lands in northwestern Wyoming. The plaintiffs filed suit in October 1998 alleging several NEPA violations and requesting an immediate injunction to stop any organized hunt of bison on federal lands. *See* Compl. ¶ 1–2. The court granted the plaintiffs' motion to enjoin, and ordered the defendants not to participate in the destruction of bison until they had complied with NEPA. *See* Mem.Op. dated October 30, 1998 at 8. The court noted in its Memorandum Opinion that the federal defendants had violated NEPA by failing to address sufficiently all environmental concerns in the Jackson Bison Plan.

Some context on the administrative process will be useful. NEPA requires agencies to prepare a detailed statement addressing major federal actions "significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(C). This requirement also covers separate actions that cumulatively have a significant effect on the environment. *See* 40 C.F.R.

§ 1508.27(b)(7). The statement an agency must prepare is known as the Environmental Impact Statement (EIS). *See* 42 U.S.C. § 4332(C)(i)–(iv). If an agency concludes that the proposed action does not require an EIS, then the agency must prepare an Environmental Assessment (EA) to explain why a more detailed environmental analysis is not necessary. *See* 40 C.F.R. § 1501.4(b). The agency then determines from the EA if an EIS is required. *See* 40 C.F.R. § 1501.4(c). If, based on the findings in the EA, an agency decides that a proposed action or a group of proposed actions would not require an EIS, then the agency must issue a finding of no significant impact (FONSI) explaining why the proposed action(s) would not significantly impact the environment. *See* 40 C.F.R. §§ 1501.4(e), 1508.13.

In this case, the federal defendants prepared a FONSI in 1996 concerning the proposed management of the bison on the National Elk Refuge ("Elk Refuge") outside of Jackson Hole, Wyoming. In the FONSI, the federal defendants created the Jackson Bison Plan, which included a supplemental feeding program for the bison and provided for organized hunts of the bison. *See* FONSI dated Sept. 1997. The Jackson Bison Plan did not address other agency actions that affect the bison management, specifically the effect of the elk supplemental feeding program on the bison. *See id.* The court ruled that this omission within the Jackson Bison Plan violated NEPA. *See* Mem.Op. at 8.

On June 21, 2000, the federal defendants withdrew the FONSI and filed this motion to dismiss. *See* Fed. Defs.' Mot. to Dismiss at 1. The intervenor defendant filed a similar motion. *See* Intervenor Def.'s Mot.

to Dismiss. The intervenor defendant's motion to dismiss makes the same assertion as the federal defendants' motion, namely, that the withdrawal of the FONSI moots the current controversy.[1] *See id.* at 3.

Since the roots of this dispute date back several hundred years, a brief review of history will provide an important backdrop to the current controversy. Until the mid–1800's, millions of buffalo roamed the Great Plains and the Rocky Mountains. *See* Encyclopaedia Britannica, *American Bison* (Feb. 22, 2001), *available at* www.britannica.com/bcom/e ... /0,5716,-82455+1+80311,00. html?query=americanbison. Although Native Americans hunted buffalo, the threat of extinction came only with the westward movement of settlers, the introduction of unregulated hunting with guns, and the evolution of bison hunting for sport rather than for subsistence. *See id.* In fact, train companies offered trips to tourists allowing them to shoot buffalo from the train coach during travel. *See* Columbia Encyclopedia, Sixth Edition, *Bison* (2001), *available at* www.bartleby.com/65/bi/bison.html.

Most striking in retrospect was the government-promoted mass destruction of buffalo. *See id.* Some federal government officials believed that one way to tame the Native Americans was to slaughter the buffalo population. *See* 4 Cong. Rec. 1239 (Feb. 23, 1876). For example, Texas Representative James Throckmorton declared on the floor of Congress, "I believe it would be a great step forward in the civilization of the Indians and the preservation of peace on the border if there was not a buffalo in existence." *Id.*

---

1. Since the federal defendants and the intervenor defendant both base their motions to dismiss on the same theory, the court will refer to both as the "defendants' motion to dismiss."

**4**

In the 20th Century, the government steadily reversed course, favoring policies of wildlife protection. In 1912, Congress created the National Elk Refuge in northwestern Wyoming as a winter reserve for elk. *See* 16 U.S.C. § 673. In 1929, the federal government created the Grand Teton National Park ("GTNP") as part of the National Parks System directly adjacent to the Elk Refuge. *See* 16 U.S.C. §§ 406-1 *et seq.* The United States Fish and Wildlife Service ("FWS") manages the Elk Refuge and the United States Park Service ("Park Service") manages the GTNP.

Beginning in about 1912, the federal government implemented a winter-feeding program on the Elk Refuge to provide an adequate winter food supply for the elk. Each winter, the federal government decides, based on several factors, how much it would feed the elk in the upcoming year. Since 1912, only several winters have been warm enough to allow the federal government not to provide the elk with any supplemental feed. *See* Gov.Ex. 2 at 129–30. The federal government has never prepared an environmental analysis, addressing the Elk Refuge supplemental-feed program. *See* Federal Defs.' Opp'n to Pls.' Mot. for Prelim.Inj. ("Fed. Defs.' Opp'n") at 21.

Because human beings killed the last bison in northwestern Wyoming in about 1840 after decades of unregulated hunting, the Park Service reintroduced a small herd of 20 bison from Yellowstone National Park into the Jackson Hole area in 1948. *See id.* at 5. The Wyoming Game and Fish Department managed the herd. In 1968, a portion of the herd escaped the fenced area and roamed free within the Grand Teton National Park. *See id.* During the winter of 1975–76, the bison began to migrate south to the Elk Refuge and thereafter spent a large majority of each winter on the Elk Refuge. *See* Jackson Bison Plan at 6.

Sometime after the migration, the bison discovered the supplemental food for the elk and began foraging. *See id.* The increased consumption of the feed by the bison displaced the elk. *See id.* To eliminate this problem, the Elk Refuge staff began to put out separate feed lines for the bison and elk in 1984. *See id.* Largely because of the availability of additional feed in the winter, the bison herd in the area has grown rapidly to more than 400. Based on this fact, the federal defendants admit in the withdrawn FONSI that the elk supplemental-feed program significantly affects the bison herd. *See* Jackson Bison Plan at 35–38.

In 1996, as a result of unresolved bison-management issues, the Grand Teton National Park, the Elk Refuge, the Wyoming Game and Fish Department, and the Bridger Teton National Forest (managed by the United States Forest Service) prepared the Jackson Bison Plan and Environmental Assessment. *See* Fed. Defs.' Opp'n at 2. The Jackson Bison Plan proposed several ways to control the growth of the bison herd, including a supplemental feeding program and organized hunts. This coalition of groups released the Jackson Bison Plan as part of the FONSI in 1996. The federal defendants stated in the FONSI that the Jackson Bison Plan "does not constitute a major federal action significantly affecting the quality of the human environment" and thus, did not warrant the preparation of an EIS. *See* FONSI dated September 1997 at 5.

In 1998, the federal defendants organized a hunt of the bison herd. *See* Fed. Defs.' Opp'n at 9. On October 1, 1998, the plaintiffs filed their complaint and, on October 9, 1998, the plaintiffs filed an application for a preliminary injunction seeking to enjoin the federal defendants in this court.

*See* Compl. and Pls.' Mot. for Prelim.Inj. The complaint alleged, among other things, several NEPA violations. *See* Compl. ¶¶ 70–74. In its October 30, 1998 Memorandum Opinion, the court found that the federal defendants had violated NEPA and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"), by omitting the impact of the elk supplemental-feeding program on the bison. *See* Mem. Op. at 8–9.

The plaintiffs argue that since the elk supplemental-feeding program continues to exist without any environmental analysis, the federal defendants have not resolved the controversy by merely withdrawing the FONSI. *See* Pls.' Opp'n at 11. For the reasons that follow, the court rules that the controversy remains live until the federal defendants comply with NEPA.

### III. DISCUSSION

#### A. Legal Standard

■ A case is moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Albritton v. Kantor*, 944 F.Supp. 966, 974 (D.D.C.1996) (Urbina, J.) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). It is well established that a "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)).

■ The standard for determining whether a case or controversy is mooted by a defendant's voluntary conduct is "stringent." *See id.* In determining moot-ness, the court has to make "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting the mootness." *Id; see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.").

■ The movant must also show that "interim relief and events have completely and irrevocably eradicated the effects of the alleged violation." *Albritton*, 944 F.Supp. at 974 (citing *Davis*, 440 U.S. at 631, 99 S.Ct. 1379).

#### B. Analysis

##### 1. The Defendants Seek to Dismiss on the Ground that the Case is Moot

The federal defendants and the intervenor defendant both assert that the voluntary withdrawal of the FONSI voids any illegal conduct and moots the current controversy. Both defendants claim that since there is no bison management plan in effect, the NEPA violations no longer exist. Additionally, the federal defendants present signed assurances by agency heads that no planned bison hunts will occur until they prepare a Jackson Bison Plan that complies with NEPA. The federal defendants also state that they are taking steps to comply with NEPA by contracting with the United States Institute for Environmental Conflict Resolution (USIECR) to prepare a situation assessment. *See* Fed. Defs.' Reply at 2. While

these may be appropriate steps to comply with NEPA, they do not resolve all the issues raised in the complaint.

## 2. The Court Will Deny Both Defendants' Motions to Dismiss

### a. The Defunct FONSI Does Not Encompass the Entire Controversy

■ The complaint alleges that both the federal defendants' plan to organize bison hunts and the supplemental-feeding programs violated NEPA and the APA. The plaintiffs assert the continued validity of their original claim that the federal defendants violated NEPA by failing to follow appropriate protocol when implementing the elk supplemental feeding program and the bison supplemental feeding program. In fact, the court ordered the federal defendants to address both supplemental feeding programs when preparing a new, adequate environmental assessment. *See* Mem.Op. at 8 (citing 40 C.F.R. § 1508.25(a)(2)). In the Memorandum Opinion, this court held that because the "agency is involved in several actions which, cumulatively, have a significant impact on the environment, then these actions should be considered in the same environmental document so as to assess adequately their combined impacts." *See* Mem.Op. at 8 (citing 40 C.F.R. § 1508.25(a)(3)).

The federal defendants incorrectly assert that the complaint alleges only the FONSI claim and, thus, that the FONSI's withdrawal moots the entire case. The federal defendants also mistakenly assert that the complaint did not include the alleged violations concerning the elk supplemental feeding program and, therefore, that the court cannot consider this issue now. In fact, the complaint clearly alleges NEPA violations regarding the supplemental feeding programs for both the elk and the bison. *See* Compl. ¶ 2. Thus, the federal defendants have failed to demonstrate how the withdrawal of the FONSI moots the entire case.

### b. The Federal Defendants' Voluntary Withdrawal of the FONSI Does Not Deprive the Court of Jurisdiction

The federal defendants also contend that the withdrawal of the FONSI moots the controversy. The court disagrees. As the Supreme Court has held, "[I]t is well settled that a 'defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Laidlaw*, 528 U.S. at 189, 120 S.Ct. 693 (quoting *City of Mesquite*, 455 U.S. at 289, 102 S.Ct. 1070). In *Laidlaw*, the Supreme Court denied the defendant's motion to dismiss for mootness when a facility voluntarily closed after public discovery of permit violations. *See id.* Reinforcing its precedent, the Court held that a case would only become moot if the event "made it absolutely clear that [Laidlaw's permit] violations could not reasonably be expected to recur." *Id.* at 193, 120 S.Ct. 693 (citing *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203, 89 S.Ct. 361).

In this case, the federal defendants have not made clear how they are currently handling the elk supplemental feeding program. Since the court noted in its Memorandum Opinion that "an agency may not segment actions to unreasonably restrict the scope of the environmental review process," the withdrawal of the FONSI does not address this issue. *See* Mem.Op. at 8 (citing *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 159 (D.C.Cir.1985)). In addition, because the federal defendants have never prepared an EA addressing the elk supplemental feeding plan, the court assumes that the feeding continues today. Since the court assumes that the elk feed-

ing continues, the court can infer, consistent with the Memorandum Opinion, that this conduct continues to affect the bison and the overall environment.

■ Moreover, the federal defendants have not met their heavy burden of persuading the court that the challenged actions will not resume if the court rules that the case is moot. *See Laidlaw*, 528 U.S. at 189, 120 S.Ct. 693. The stringent standard exists to ensure that defendants cannot "insulate themselves from challenged conduct simply by suspending the illegal activity." *Blue Ocean Preservation Society v. Watkins*, 767 F.Supp. 1518, 1524 (D.Haw. 1991). For example, the Supreme Court declined to moot a claim to enjoin illegal activity by police officers simply because an administrative moratorium had banned the practices. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 100–101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1982). The Court reasoned that the moratorium was "insufficient to ensure that the challenged actions would not recur." *Id.* Likewise, the Supreme Court rejected a city's claim that retracting an illegal city ordinance mooted the city's unconstitutional licensing process. *See City of Mesquite*, 455 U.S. at 289, 102 S.Ct. 1070 ("In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.")

In the instant matter, the federal defendants present signed affidavits and a contractual agreement to show that they have taken steps to comply with NEPA. The court encourages these efforts, but notes that these actions alone do not render the case moot. *See Laidlaw*, 528 U.S. at 190, 120 S.Ct. 693; *W.T. Grant*, 345 U.S. at 632, 73 S.Ct. 894. The affidavits and contractual agreement are not binding, and given the federal defendants' history of noncompliance with NEPA concerning the

elk supplemental feeding program, there is not enough evidence to persuade the court that agency actions significantly impacting the environment will not recur. *See Blue Ocean Preservation Society*, 767 F.Supp. at 1522, 1523, 1525 (the defendant's promise to complete the required EIS did not render the issue moot; while the defendants agreed to comply with NEPA, they "consistently maintained that NEPA does not require [an EIS]. . . ." In light of the defendant's steady opposition to compliance, the court retained jurisdiction to ensure performance.). Accordingly, the court rules that this controversy is not moot and that the court still has jurisdiction.

### c. The FONSI Withdrawal Does Not Eradicate the Effects of the Violation

The federal defendants' removal of the unlawful FONSI does not afford the plaintiffs a full remedy since the withdrawn FONSI merely addressed one of the complaint's claims. In addition, when agency activities, such as supplemental feeding programs, affect wildlife and the environment and no EA exists, then NEPA violations remain. *See Calvert Cliffs' Coordinating v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1114–1118 (D.C.Cir.1971). While the withdrawal of the Jackson Bison Plan may have stopped the killing of the bison, the elk supplemental feeding program continues to affect the environment, including the bison herd.

In arguing that the plaintiffs have attained full relief, the federal defendants rely on case law that is easily distinguishable from the current controversy. For instance, they cite *Friends of Keeseville v. Federal Energy Regulatory Commission*, wherein the court held that the plaintiff's request for relief was extinguished when the permit at issue was permanently cancelled. *See Friends of Keeseville*, 859 F.2d

230, 232 (D.C.Cir.1988). At the time the petition for review was filed, the controversy was live because the permit was in use. *See id.* When the case reached the court, however, the permit holder had permanently lost the permit rights. *See id.* Accordingly, no harm existed nor were the plaintiffs under threat of the same harm in the near future since the permit was permanently cancelled. *See id.* This scenario differs significantly from the case at bar.

■ Here, the plaintiffs' request that the federal defendants fully comply with NEPA remains unresolved. "As long as effective relief may still be available to counteract the effects of the violation, the controversy remains live and present." *See Greenpeace v. National Marine Fisheries Service,* 80 F.Supp.2d 1137, 1151 (D.Wash.2000) (citing *Northwest Envtl. Defense Ctr. v. Gordon,* 849 F.2d 1241, 1244–45 (9th Cir.1988)). Since the federal defendants have not yet complied with NEPA, and the elk supplemental feeding presumably continues, then the cumulative impact remains within the affected area and the plaintiffs' request for relief survives.

### d. Remedy

Although NEPA does not provide time limits for agency action, the statute encourages federal agencies to set such limits. *See* 40 C.F.R. § 1501.8. In light of the fact, however, that the defendants have been on notice of the NEPA violations since the court's Memorandum Opinion issued October 30, 1998—nearly two-and-a-half years ago—the court will give the federal defendants six months from the date of this Memorandum Opinion and Order to submit to the court a proposed plan to comply fully with NEPA.

In addition, the court will retain jurisdiction over this case until the defendants fully comply with NEPA. *See Sierra Club*

*v. Penfold,* 857 F.2d 1307, 1322 (9th Cir. 1988); *Public Service Co. v. Andrus,* 825 F.Supp. 1483, 1509–11 (D.Idaho 1993). Finally, the court notes that the plaintiffs have offered to dismiss their remaining claims against the defendants if the defendants agree to certain stipulations. *See* Pls.' Opp'n at 1.

## IV. CONCLUSION

For all of these reasons, the court denies the federal defendants' and the intervenor defendant's motions to dismiss. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously executed and issued this 9th day of March, 2001.

## *ORDER*

DENYING THE FEDERAL DEFENDANTS' MOTION TO DISMISS; DENYING THE INTERVENOR DEFENDANT'S MOTION TO DISMISS

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously executed and issued this 9th day of March, 2001, it is hereby

**ORDERED** that the federal defendants' and the intervenor defendant's motions to dismiss are **DENIED.**

**SO ORDERED.**