Sullivan v. NH DOC                          03-CV-387-SM   04/29/05

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Steve Sullivan,
     Plaintiff

     v.                                   Case No. 03-cv-387-SM
                                          Opinion No. 2005 DNH 074
Phil Stanley, Commissioner,
New Hampshire Department of
Corrections,
     Defendant


                    **O R D E R**


     Steve Sullivan has sued in two counts, asserting that he was

subjected to disparate treatment because of his gender, in

violation of 42 U.S.C. §§ 2000e-2(a)(1) (Count I), and that

defendant is liable to him for negligent infliction of emotional

distress (Count II).  Before the court is defendant's motion for

summary judgment.  Plaintiff objects.  For the reasons given,

defendant's motion for summary judgment is granted.



                **Summary Judgment Standard**

     Summary judgment is appropriate when the record reveals "no

genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law."  FED. R. CIV. P.

56(c).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)).

"The role of summary judgment is to pierce the boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trial-worthy issue exists."  Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving party to present evidence showing the existence of a trialworthy issue."  Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st Cir. 2004) (citing Anderson, 477 U.S. at 248; Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  To meet that burden the nonmoving party, may not rely on "bare allegations in [his or her] unsworn pleadings or in a lawyer's brief."  Gulf Coast, 355 F.3d at 39 (citing Rogan v. City of Boston, 267 F.3d 24, 29 (1st Cir. 2001); Maldonado-Denis v.

2

Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). When ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)).

## Background

Steve Sullivan was hired by the New Hampshire Department of Corrections ("DOC") as a corrections officer trainee in May of 1996. He was promoted to his current position as a corrections officer ("CO") in November of 1996. (Def.'s Mot. Summ. J., Ex. A (Currier Aff.) ¶ 5.) In October of 1999, Sullivan was assigned to a position in the prison kitchen and inmate dining area on the shift that ran from 4:00 a.m. until 12:00 p.m. (Currier Aff. ¶ 13.) Sullivan's co-workers in the kitchen included CO Randy Patrick and CO Aileen Jacques. (Currier Aff. ¶ 13.)

In April of 2000, CO Jacques had a verbal altercation with CO Patrick, which resulted in Patrick's immediate termination, based upon Jacques's claim that Patrick had sexually harassed her. (Currier Aff. ¶ 14.) Patrick successfully challenged his termination before the New Hampshire Personnel Appeals Board ("PAB") which ruled, inter alia, that Patrick had not engaged in any conduct that violated the state's sexual harassment policy. (Currier Aff., Attach. 8.)

The PAB heard CO Patrick's appeal on July 12 and August 16, 2000. (Currier Aff., Attach. 8.) CO Sullivan testified on Patrick's behalf at the July 12 session. (Currier Aff., Attach. 8.) As he was waiting to testify, in an area outside the hearing room, Sullivan conversed with CO Dan Turgeon and former CO Jonathan Topham. (Def.'s Mot. Summ. J., Ex. B (Nihan Aff.) Attach. 1.) Among other things, Sullivan expressed his opinion that the DOC's sexual harassment policies were ineffectual and disproportionately applied against men. (Nihan Aff., Attach. 1.) Also present in the waiting area was Marilee Nihan, Administrator of Programs for the DOC. (Nihan Aff., Attach. 1.) Nihan found the conversation to be "very disrespectful, in most cases untrue,

4

and designed to incite negative feelings in the others." (Nihan Aff., Attach. 1.) For that reason, she approached Sullivan and told him that he ought not state such opinions in public. (Nihan Aff., Attach. 1.) Sullivan disagreed with Nihan and told her so. (Nihan Aff., Attach. 1.) After the incident, Nihan filed a complaint against Sullivan with Warden Jane Coplan and the New Hampshire State Prison's Administrator of Security, Richard Gerry. (Nihan Aff., Ex. 1.) No action was taken against Sullivan as a result of his interaction with Nihan.

At some point after CO Patrick's termination – plaintiff does not give a date – CO Jacques filed a sexual-harassment complaint against Sullivan. (Currier Aff. ¶ 16.) That complaint resulted in no investigation and no formal action against Sullivan, but Sullivan was advised by Captain Beltrami to minimize his contact with Jacques. (Currier Aff. ¶ 16.) Sullivan did so.

In early June of 2000 – again, plaintiff does not give an exact date – CO Jacques filed a second complaint against CO Sullivan, asserting that he had created a hostile work

environment. (Currier Aff. ¶ 17.) Like the earlier complaint, the June 2000 complaint resulted in no investigation and no formal action against Sullivan. (Currier Aff. ¶ 18.) Sullivan, concerned that two baseless complaints had been filed against him, asked Lieutenant Geary what could be done to prevent further complaints. Geary told Sullivan that there was nothing DOC could do to stop the complaints, and told Sullivan that he should ask for a transfer to another area of the prison, to further minimize his contact with Jacques.

On June 3, 2000, CO Sullivan was issued a "Statement of Counseling" by Sgt. Tony Thibeault, the 1st Shift Interior Squad Leader. (Currier Aff. ¶ 20.) That statement said:

> Reason for counseling: (Insubordination) <u>On 6/3/00 at aprox. 1015 you were insubordinate toward this supervisor by arguing with me after being told that you were forced overtime. You repeatedly stated to me that you were not going to be forced overtime even after I advised you that you were on the bottom of the seniority roster and that no one volunteered. This kind of behavior on your part can not and will not be tolerated. Future incidents will result in disciplinary action.</u>

(Currier Aff., Attach. 10 (emphasis in the original).) Sullivan refused to sign the Statement of Counseling. (Currier Aff. Attach. 10.)

On July 6, 2000, CO Sullivan was granted a lateral transfer from "3rd Kitchen T/W to 3rd CCU T/W," as he requested, effective June 30, 2000. (Currier Aff., Attach. 13.) On November 10, 2000, he was granted a transfer from "CCU 3rd T/W to INT 3rd F/S," effective that same day. (Currier Aff., Attach. 14.)

On December 13, 2000, Corporal Havelock issued a written order stating, in full: "CO Sullivan is not allowed in kitchen core or basement unless officer is on official business." (Currier Aff., Attach. 9.) At the time that order was issued, CO Jacques was still assigned to the kitchen.

On January 9, 2001, CO Sullivan was issued "a written warning for failure to meet the work standard." (Currier Aff., Attach. 11.) Specifically, Sullivan was cited for reporting to a training class in inappropriate attire, failing to obey an order

7

from a superior officer,[1] and failing to interact with co-workers and management in a cooperative way.[2] (Currier Aff., Attach. 11.)

On April 19, 2001, CO Sullivan was granted a transfer from "INT 3rd F/S to R&D 3rd S/M," effective May 4, 2001. (Currier Aff., Attach. 15.) On October 4, 2001, he filed an "Official Lateral Request Form," seeking a transfer from his third-shift position in R&D to a first-shift position in the kitchen. (Currier Aff. ¶ 26, Attach. 17.) By memorandum dated October 24, 2001, Sullivan was informed that his request had been denied. (Currier Aff., Attach. 18.) That memorandum stated, in pertinent part:

_____

[1] When informed of the policy prohibiting correctional officers from wearing jeans, Sullivan told Lieutenant Fouts that if the policy did exist, he would respond by wearing appropriate attire inside out and backwards. Subsequently, Sullivan refused to step outside the classroom to discuss the matter, as requested by Lt. Fouts. (Currier Aff., Attach. 11.)

[2] Sullivan's uncooperative behavior included refusing to leave the class when asked to do so and stating, in response to a question to the class, that his role in an emergency was "to pass the buck." (Currier Aff., Attach. 11.)

8

I regret that you have not been selected for the recent vacancy in the Kitchen.  The reason is as follows:

Letter of Warning issued to you in December, 2000.

Requirement of the 1st Shift Cpl to order you to keep out of the kitchen core due to the hostile working environment you were creating with a 1st shift officer. Of additional concern was your display in a meeting with Sgt Whitten and Sgt Snyder over this order.

Thank you for your interest in this position.

(Currier Aff., Attach. 18.)

Based upon the foregoing, CO Sullivan filed a charge of employment discrimination based on gender with the New Hampshire Human Rights Commission, which made a finding of "no probable cause" on April 17, 2003.  On June 10, 2003, the Equal Employment Opportunity Commission issued Sullivan a "right to sue" letter. This suit followed.

In Count I, plaintiff asserts that he "was treated differently than other female employees in that he was subject to various work actions and disparate treatment than female

9

employees in the implementation of the Defendant's sexual harassment policies in violation of Title VII . . . in that he was subjected to disparate treatment as a result of his gender." (Compl. ¶ 57.) In particular, plaintiff identifies the following instances of alleged disparate treatment:

1. Plaintiff was subjected to adverse work actions based upon the unfounded and, more importantly, the uninvestigated claims of harassment by a female employee;

2. Plaintiff was told by numerous superior[s] that the co-worker would utilize the Defendant's harassment policies affirmatively and wrongfully against the Defendant [sic] and failed to do anything to correct the co-worker's actions;

3. Plaintiff was held to a different standard than other female employees in that the unfounded charges by the female employee resulted in restriction on the Plaintiff's employment status, even after the Defendant knew the charges to be unfounded.

(Compl. ¶ 58.) Count II asserts a claim for negligent infliction of emotional distress, based upon defendant's failure to provide Sullivan with a work environment that was free from disparate treatment.

10

**Discussion**

Defendant moves for summary judgment on Count I on grounds that plaintiff has failed to make out a prima facie case for gender discrimination and argues that the court should decline to exercise supplemental jurisdiction over Count II, or should dismiss that count for failure to state a claim on which relief can be granted.

Count I

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" <u>Reed v. MBNA Mktg. Sys., Inc.</u>, 333 F.3d 27, 31 (1st Cir. 2003) (quoting 42 U.S.C. § 2000e-2(a)(1)). "The core inquiry in . . . disparate treatment cases is whether the defendant intentionally discriminated against the plaintiff because of [his or] her gender." <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d 62, 71 (1st Cir. 2004) (citing <u>Cumpiano v. Banco Santander P.R.</u>, 902 F.2d 148, 153 (1st Cir. 1990)). That is, "in a disparate treatment case, '[t]he central

11

focus of the inquiry . . . is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.'" Thomas v. Digital Equip. Corp., 880 F.2d 1486, 1490 (1st Cir. 1989) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)) (internal quotation marks omitted).

Where, as here, there is no direct evidence of discrimination, plaintiff's claim must be analyzed under "the burden-shifting analysis first established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003) (citing Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000)).

> Under the McDonnell Douglas analysis, a plaintiff must establish a prima facie case, which in turn gives rise to an inference of discrimination. See Dichner v. Liberty Travel, 141 F.3d 24, 29-30 (1st Cir. 1998). The employer then must state a legitimate, nondiscriminatory reason for its decision. See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44 (1st Cir. 2002). If the employer can state such a reason, the inference of discrimination disappears and the plaintiff is required to show that the employer's stated reason is a pretext for discrimination. See id. at 45.

12

Kosereis v. Rhode Island, 331 F.3d 207, 212 (1st Cir. 2003).

Turning to the first step of the McDonnell Douglas analysis, "[t]he elements of the plaintiff's prima facie case vary according to the nature of [his or] her claim." Rathbun, 361 F.3d at 71; see also Thomas, 880 F.2d at 1490 ("The prima facie case required of a plaintiff varies with respect to the employment action taken") (citing McDonnell Douglas, 411 U.S. at 802 n.13); Oliver v. Digital Equip. Corp., 846 F.2d 103, 107 (1st Cir. 1988)).

Here, it is somewhat difficult to determine precisely which employment actions plaintiff claims constituted gender-based disparate treatment. The portion of the complaint in which Count I is set out, quoted above, is vague, at best. In the "fact" section of his complaint, plaintiff alleges that after the second complaint was filed against him by CO Jacques, he "found his otherwise commendable work record with the D.O.C. further undermined by several 'write-ups' by D.O.C. officials for conduct

13

on [his] part . . . that had not warranted a reprimand by D.O.C. officials or that had been outright condoned by D.O.C. officials." (Compl. ¶ 38.) In that same section, plaintiff identifies, as a further example of disparate treatment, the December 13, 2000, directive from Cpl. Havelock, barring him from the kitchen unless he was there on official business, a directive which, upon plaintiff's information and belief, has never been given to any corrections officer other than himself. (Compl. ¶ 51.)

However, in his objection to summary judgment, plaintiff appears to limit his disparate treatment claim to the denial of his request for a transfer back into the kitchen, "submit[ting] that the baseless failure to grant a transfer, when the transfer sought by the Plaintiff was more advantageous (albeit not monetarily) to the Plaintiff, constitute[d] an adverse employment action by the Defendant." (Pl.'s Obj. to Summ. J.) As the failure to grant plaintiff's request for a transfer is the only employment action mentioned in the argument section of plaintiff's memorandum of law, the court construes Count I as

14

asserting a claim that defendant's failure to grant plaintiff a transfer constituted unlawful gender-based disparate treatment.

The court of appeals for this circuit has not had the occasion to set out the elements of a prima facie case of discriminatory failure to transfer.  However, the court has established the requisite elements for claims of discriminatory failure to promote,[3] failure to re-hire,[4] disciplinary discharge,[5]

---

[3] See Rathbun, 361 F.3d at 71 ("In a failure-to-promote claim, for example, [the] elements are that the plaintiff (i) is a member of a protected class who (ii) was qualified for an open position for which [he or] she applied, but (iii) was rejected (iv) in favor of someone possessing similar qualifications.") (citing Gu v. Boston Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002)).

[4] See Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 584 (1st Cir. 1999) ("a plaintiff alleging a failure to rehire establishes his [or her] prima facie case by showing: (i) that he [or she] belongs to a racial minority; (ii) that he [or she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his [or her] qualifications, he [or she] was rejected; and (iv) that, after his [or her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications") (citing McDonnell Douglas, 411 U.S. at 802).

[5] See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999) ("the appellant's prima facie case normally would include a showing that he was a member of a protected class and qualified for the employment he held, that his employer took an adverse employment action against him, and that his position

15

and termination.[6]  Based upon the prima facie cases established

for those causes of action, it seems appropriate to describe a

prima facie case for discriminatory failure to transfer much like

the one set out in Smith v. Alabama Department of Corrections:

> To establish a prima facie case of failure to transfer,
> [plaintiff] must show that he: (1) is a member of a
> protected class, (2) was qualified for the position,
> (3) suffered an adverse employment action, and (4)
> someone outside of the protected class was hired into
> the position.

145 F. Supp. 2d 1291, 1297 (M.D. Ala. 2001) (holding that prison

employee denied a lateral transfer suffered no adverse employment

action when sought-after position involved no increase in rank,

remained open for (or was filled by) a person whose
qualifications were similar to his") (citing St. Mary's Honor
Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Smith v. F.W. Morse &
Co., 76 F.3d 413, 421 (1st Cir. 1996)).

[6] See Feliciano de la Cruz, 218 F.3d at 5 ("In employment
termination cases, a plaintiff establishes a prima facie case by
showing that: (1) the plaintiff is within a protected class; (2)
she [or he] was qualified for, and performing her [or his] job at
a level that met the employer's legitimate expectations; (3) she
[or he] was nevertheless dismissed; and (4) after her [or his]
departure, the employer sought someone of roughly equivalent
qualifications to perform substantially the same work.") (citing
Mulero-Rodriquez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir.
1996); Lipsett v. Univ. of P.R., 864 F.2d 881, 899 (1st Cir.
1988)).

pay, benefits, etc.) (citing <u>Hinson v. Clinch County, Bd. of Educ.</u>, 231 F.3d 821, 828 (11th Cir. 2000)); <u>see also</u> <u>Parker v. Del. Dep't of Pub. Safety</u>, 11 F. Supp. 2d 467, 476 (D. Del. 1998) (explaining, in Title VII action based upon denial of transfer, "[o]ne of the ways for a plaintiff to establish a prima facie case of disparate treatment is to prove she belongs to a protected class, applied for and was qualified for an employment position, was denied the position, and someone outside of the protected class was awarded the position") (citation omitted).

Defendant argues that he is entitled to summary judgment because plaintiff has failed to establish two separate elements of his prima facie case: (1) an adverse employment action; and (2) preferential treatment of a similarly situated female. Plaintiff counters that failure to grant him the transfer he requested qualifies as an adverse employment action and that "the failure to transfer the Plaintiff (who is male) back to the kitchen based upon the unsubstantiated allegations by C.O. Jacques (who is female), having never instituted an investigation on the same, is the exact type of discriminatory action[]

17

consistently take[n] by the D.O.C. regarding sexual harassment claims filed by female C.O.'s against male C.O.'s."

Whether denial of a request for a transfer constitutes an adverse employment action is an interesting legal question. In Randlett v. Shalala, 118 F.3d 857 (1st Cir. 1997), which involved a Title VII retaliation claim, the court of appeals held that an employer's refusal to grant a hardship transfer qualified as an adverse employment action, id. at 862, but did so at least in part on the basis of evidence not present in this case, i.e., that for plaintiff Randlett's employer, "a permanent transfer for hardship reasons [was] a common enough practice and so arguably a 'privilege' of employment," id. Here, the record is entirely silent on DOC policies and practices regarding lateral transfers.

Moving beyond the First Circuit, courts have used two different frames of reference for analyzing denial of transfer claims. One approach, which analogizes the denial of a transfer request with a decision not to hire, is illustrated by the following discussion in Parker:

18

Although some transfers may not be considered adverse, see, e.g., Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996) (holding that purely lateral transfer imposed upon a plaintiff cannot rise to an adverse employment action to satisfy a disparate treatment or retaliation based claim), the denial of a sought after transfer is an adverse action. Bruno [v. W.B. Saunders Co.], 882 F.2d [760,] 762 [(3d Cir. 1989)]. This is unsurprising, since Title VII protects against discrimination in hiring, and applying for a job in another division is similar to applying for the same position from outside of the company. Further, the denial of a transfer could be characterized as the denial of an employment opportunity depending on the nature of the . . . position and the associated job opportunities.

11 F. Supp. 2d at 477 (footnotes omitted). According to the Parker view, denial of a transfer request must necessarily be an adverse employment action because failure to transfer is a form of failure to hire, and failure to hire is an adverse employment action.

The other approach begins with the rule that many transfers do not qualify as adverse employment actions:

While it logically may make sense to say that a denial of a transfer is an 'adverse' action because it is not what the employee wished, such an action is no more 'adverse,' logically speaking, than a purely lateral transfer made against an employee's will, which the

19

Eleventh Circuit has stated in [Doe v.] DeKalb County
[Sch. Dist., 145 F.3d 1441 (11th Cir. 1998)] does not
necessarily rise to the level of an adverse employment
action.

Smith, 145 F. Supp. 2d at 1299.  Stated another way:

Logic suggests that, if making a "purely lateral
transfer" cannot constitute "adverse employment
action," see Ledergerber [v. Stangler], 122 F.3d
[1142,] 1144-45 [(8th Cir. 1997)], then failure to make
a "purely lateral transfer" also would not constitute
"adverse employment action."

Hennick v. Schwans Sales Enters., Inc., 168 F. Supp. 2d 938, 954

(N.D. Iowa 2001) (emphasis in the original).  Under the view

articulated in Smith and Hennick, if it is not an adverse

employment action for an employer to alter an employee's work

situation by transferring him against his will, then it is surely

not an adverse employment action for an employer to leave an

employee's work situation unchanged by denying a request for a

lateral transfer.

The Smith-Hennick view appears to be more widely held than

the Parker position:

A "clear trend of authority" holds that a "'transfer
that does not involve a demotion in form or substance [

20

] cannot rise to the level of a materially adverse employment action.'" Brown [v. Brody], 199 F.3d [446,] 456-57 [(D.C. Cir. 1999)] (quoting Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997), Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action." Boone [v. Goldin], 178 F.3d [253,] 256-57 [(4th Cir. 1999)]; accord Watts v. Kroger Co., 170 F.3d 505, 512 (5th Cir. 1999). This rule regarding transfers applies with equal force to the denial of transfer requests. See LePique v. Hove, 217 F.3d 1012, 1014 (8th Cir. 2000) (finding "no reason to suppose" that a failure to transfer should be "treated any differently" than an actual transfer).

Wagstaff v. City of Durham, 233 F. Supp. 2d 739, 744-45 (M.D.N.C. 2002); see also Nonnenmann v. City of New York, 174 F. Supp. 2d 121, 133 (S.D.N.Y. 2001), overruled on other grounds by Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121 (2d Cir. 2005) ("I have found no case in which denial of a request for a purely lateral transfer was found to constitute an adverse employment action."). "Most cases addressing whether a lateral transfer (or denial thereof) constitutes an adverse employment action for purposes of a Title VII discrimination claim have concluded that it does not." Craven v. Tex. Dep't of Crim. Justice, 151 F. Supp. 2d 757, 766 (N.D. Tex. 2001) (collecting cases). Moreover, "[w]hen courts have held a lateral transfer to be an 'adverse

21

employment action,' the position sought or lost has been objectively better in some respect." Id. (citing Lulac Council 4433 & 4436 v. City of Galveston, 979 F. Supp. 514, 518-19 (S.D. Tex. 1997)).

Here, plaintiff has produced no evidence that a transfer to the position he sought in the kitchen represented a promotion in form or substance, or entailed any increase in "compensation, job title, level of responsibility, or opportunity for promotion." Wagstaff, 233 F. Supp. 2d at 744 (quoting Boone, 178 F.3d at 256-57). In other words, he has produced no evidence tending to show that the position he wanted to transfer to was objectively better than the position he wanted to transfer from. Thus, the denial of plaintiff's transfer request was not an adverse employment action for purposes of his Title VII disparate impact claim. See Wagstaff, 233 F. Supp. 2d at 745 (denial of lateral transfer to police unit that "would have enabled [plaintiff] to attend college and spend time with his family in more regular intervals" was not adverse employment action); Nonnenmann, 174 F. Supp. 2d at 133 (denial of transfer from one police precinct to another, reducing officer's daily commute from 120 miles to 93 miles, was

22

not adverse employment action); <u>Craven</u>, 151 F. Supp. 2d at 768 (denial of correctional officer's request for transfer from third shift to first shift was not adverse employment action); <u>Smith</u>, 145 F. Supp. 2d at 1298 (denial of correctional officer's request for transfer was not adverse employment action when defendant produced uncontroverted evidence that plaintiff's "rank, pay, and benefits would remain the same").

Plaintiff disagrees, arguing that he did suffer an adverse employment action because "the job in the kitchen was very appealing to [him] because the hours of employment (4:00 a.m. to 12:00 p.m.) gave [him] the ability to spend time with [his] children in the afternoon after their return from school" (Sullivan Aff. ¶ 4) and because he "enjoyed the position immensely when [he] had previously worked there because there was a generally more relaxed atmosphere in the kitchen and an overall more enjoyable atmosphere . . ." (Sullivan Aff. ¶ 5).

However, it is well established that "[w]hether an employment action is 'adverse' – and therefore actionable under Title VII – is gauged by an objective standard." <u>Marrero v. Goya</u>

of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) (citing <u>Blackie v. Maine</u>, 75 F.3d 716, 725 (1st Cir. 1996)); <u>see also</u> <u>Smith</u>, 145 F. Supp. 2d at 1297 ("In making an evaluation of whether an action is an adverse employment action, courts are to apply an objective, not a subjective, test.") (citing <u>Dekalb County</u>, 145 F. 3d at 1448-49). "If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment action." <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 532 n.6 (10th Cir. 1998) (citing <u>Dekalb County</u>, 145 F.3d 1441, 1449-50 (11th Cir. 1998) (collecting cases)); <u>see also</u> <u>Brown</u>, 199 F.3d at 457 ("Mere idiosyncracies of personal preference are not sufficient to state an injury.") (citing <u>DiIenno v. Goodwill Indus.</u>, 162 F.3d 235, 236 (3d Cir. 1998); <u>Dekalb County</u>, 145 F.3d at 1448; <u>Smart v. Ball State Univ.</u>, 89 F.3d 437, 441 (7th Cir. 1996)); <u>Craven</u>, 151 F. Supp. 2d at 766 ("That Craven expressed a preference for the day shift is insufficient to conclude that denial of her transfer request was an adverse action."); <u>Smith</u>, 145 F. Supp. 2d at 1297 ("An employment action must affect a term or condition of employment

24

and is not adverse merely because the employee dislikes it or disagrees with it.") (citing Perryman v. West, 949 F. Supp. 815, 819 (M.D. Ala. 1996)). In sum, plaintiff's preference for a position on the first shift is insufficient to create a triable issue of fact regarding the existence of an adverse employment action.

Because defendant's denial of plaintiff's request for a transfer does not qualify as an adverse employment action, plaintiff has not established a prima facie case of disparate treatment, and defendant is entitled to judgment as a matter of law on Count I.

In addition, plaintiff has failed completely to establish the fourth element of his prima facie case, namely that the position he sought via transfer was left open or went to someone outside the protected class, i.e., a female. See Smith, 145 F. Supp. 2d at 1297; Parker, 11 F. Supp. 2d at 476. Nowhere in his complaint, and nowhere in the summary judgment record, does plaintiff indicate who – if anyone at all – was selected to fill the vacancy he applied for on the first shift. If the position

was left vacant or the person selected was a woman then plaintiff could satisfy the fourth element of a prima facie case, but, if that vacancy was filled by another male, plaintiff can hardly claim that defendant disadvantaged him by impermissibly using gender as a criterion for filling the position.[7] See Parker, 11 F. Supp. 2d at 477 ("defendant's denial of plaintiff's requested transfer to the Special Investigations Forecast Unit and defendant's rejection of plaintiff's application for the DARE program combined with the subsequent selection of male troopers for the same positions state a claim of disparate treatment under Title VII") (emphasis added). Absent a factual allegation regarding what happened to the position plaintiff applied for (or, at this point, evidence on that point), plaintiff has failed to state a Title VII disparate treatment claim. Thus, on this alternative basis, defendant is also entitled to judgment as a matter of law.

Plaintiff's failure to allege or produce evidence regarding defendant's ultimate disposition of the first-shift kitchen

_____

[7] Plaintiff could, seemingly, claim that he was disadvantaged by defendant's selection of a male CO with whom CO Jacques had not had previous run-ins, but that would not support a gender-based disparate treatment claim.

26

position illustrates a broader problem with plaintiff's claim. The essence of his claim appears to be that:

> this course of conduct [as identified in the previous paragraphs] was discriminatory in nature based upon [his] gender, in that allegations made by female employees against male employees are treated with such deference as to factual allegations that the same constitutes a violation of applicable state and federal statutes.

(Compl. ¶ 53.)  In his objection to summary judgment plaintiff states:

> the failure to transfer the Plaintiff (who is male) back to the kitchen based upon the unsubstantiated allegations by C.O. Jacques (who is female), having never instituted an investigation on the same, is the exact type of discriminatory action[] consistently take[n] by the D.O.C. regarding sexual harassment claims filed by female C.O.'s against male C.O.'s.  It is this discrimination in general, and the impact of this discrimination on the Plaintiff as set forth herein, that is the basis for Plaintiff's claims.

> As earlier stated, the Plaintiff alleges that he and other male employees were treated in a significantly different manner with regard to allegations of sexual harassment by female employees due to their gender.

> . . .

> As stated in Plaintiff's earlier Objection to Defendant's Motion to Dismiss, [this] claim is somewhat novel, but equally simple: that male employees in general, and this male employee in particular, are

27

> treated differently by the Defendant based upon their
> gender when it comes to the implementation of the
> Defendant's sexual harassment policies: specifically
> that male employees (and, again, [this] male employee
> specifically) are presumed to be "guilty" of sexual
> harassment when complaints are made and suffer negative
> employment consequences as a result.

(Pl.'s Obj. to Summ. J. at 8-9.) Plaintiff is not claiming that men accused of sexual harassment were treated differently (presumably worse) than woman accused of sexual harassment, or that women making claims of sexual harassment were treated differently (presumably better) than men making claims of sexual harassment, but rather, that women making sexual harassment claims are treated well while the men they accuse are treated poorly.

Similar claims have been litigated, albeit rarely. In <u>Haley v. Virginia Commonwealth University</u>, 948 F. Supp. 573 (E.D. Va. 1996), a Title IX sex discrimination case decided under Title VII principles, <u>see</u> <u>id.</u> at 578, the plaintiff complained that

> VCU unfairly railroaded him through the procedures it
> uses to prosecute claims of sexual harassment, and that
> it did so pursuant to a discriminatory policy whereby
> the school presumes that allegations of sexual
> harassment are valid, particularly where the alleged
> harasser is male and the victim is female.

28

<u>Id.</u> at 575.  Discussing the plaintiff's prima facie case, the court stated that his "initial burden [was] one of showing that female students accused of similar conduct were treated more favorably."  <u>Id.</u> at 580.  Ultimately, the court dismissed the plaintiff's Title IX claim, <u>id.</u> at 581, because "[a]ll of his evidence pertain[ed] to his own proceedings, and there [were] no comparisons to accounts of other accused students, nor are there even naked allegations that similarly situated women [were] or even men would [have been] treated differently," <u>id.</u> at 580.

Similar reasoning is found in <u>Oakstone v. Postmaster General</u>, 332 F. Supp. 2d 261 (D. Me. 2004).  The plaintiff in <u>Oakstone</u> asserted that "the Postal Service, uncritically accept[ed] demonstrably false allegations of physical abuse, [and took] sides in favor of a female non-supervisory co-employee against him by reassigning, harassing, and demoting him," <u>id.</u> at 263, and he claimed that those actions constituted retaliation and/or gender-based harassment rather than disparate treatment, <u>id.</u> at 274.  The court in <u>Oakstone</u> denied defendant's motion for summary judgment on plaintiff's harassment claims, but that

29

decision is of little help to plaintiff here because he has not asserted a sexual harassment claim, but only a disparate treatment claim. While sexual harassment rather than disparate treatment might have proven a more viable theory of recovery on the facts of this case (but not necessarily a successful one), defendant should not be denied judgment, to which it is entitled, based upon a theory plaintiff does not advance.

Because plaintiff has not established either an adverse employment action or preferential treatment of similarly situated female COs, defendant is entitled to judgment as a matter of law on Count I.

Count II

Count II is a state law claim for negligent infliction of emotional distress, based upon defendant's alleged breach of its duty to "provide [plaintiff] with a work environment that was free from disparage treatment, and non-discriminatory workplace policies." (Compl. ¶ 72.) Under the rule stated in Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998), the court

30

declines to exercise jurisdiction over plaintiff's state law claim, which is dismissed without prejudice.

## Conclusion

For the reasons given, defendant's motion for summary judgment (document no. 17) is granted. The clerk of the court shall enter judgment in accordance with this order and close the case.


**SO ORDERED.**


_____
Steven J. McAuliffe
Chief Judge

April 29, 2005

cc:  Jennifer R. Jones, Esq.
     Mary E. Maloney, Esq.

31